STATE OF NORTH CAROLINA v. CHARLIE MASON ALSTON

No. 416A92

(Filed 8 September 1995)

**1. Jury § 141 (NCI4th)— first-degree murder—capital trial—jury selection—questions about parole eligibility —denied**

There was no error in a first-degree murder capital trial where defendant's motion to permit *voir dire* of potential jurors regarding their beliefs about parole eligibility was denied. Information regarding parole eligibility is not relevant to the issues at trial and is not a proper matter for the jury to consider in a capital sentencing proceeding. The argument that *Simmons v. South Carolina*, 129 L. Ed. 2d 133 requires that North Carolina juries be informed as to the length of time a defendant must serve before becoming eligible for parole has been consistently rejected by the North Carolina Supreme Court.

Am Jur 2d, Jury §§ 189-192, 199.

**2. Jury § 235 (NCI4th)— first-degree murder—capital trial—jury selection—death qualification**

There was no error in a first-degree murder prosecution in which the death penalty was sought in the denial of defendant's motion to prohibit death-qualification questioning.

Am Jur 2d, Jury § 279.

**3. Jury § 262 (NCI4th)— first-degree murder—capital trial—jury selection—peremptory challenges—jurors ambivalent about death penalty**

There was no error in a first-degree murder prosecution in which the death penalty was sought in the use of peremptory challenges to remove prospective jurors who were not excludable for cause but who wavered in their ability to impose the death penalty.

Am Jur 2d, Criminal Law § 685.

**4. Jury § 227 (NCI4th)— first-degree murder—capital trial—jury selection—challenges for cause— jurors ambivalent about or opposed to death penalty**

There was no abuse of discretion in a first-degree murder prosecution in which the death penalty was sought in removing

for cause a prospective juror whose responses indicated with unmistakable clarity that his bias against the death penalty would substantially impair his ability to perform his duties as a juror, and to remove two prospective jurors who indicated that they were opposed to the death penalty, who stated at times that their views on their death penalty would substantially impair their ability to follow the law, who vacillated at other times when asked whether they could set aside their beliefs and vote for the death penalty, and who were not able to state clearly their willingness to temporarily set aside their own beliefs in deference to the rule of law.

**Am Jur 2d, Jury §§ 228-233.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

5. **Jury § 150 (NCI4th)— first-degree murder—capital trial— excusal for cause—no rehabilitation**

There was no error in a first-degree murder trial in which capital punishment was sought in the trial court's refusal to afford defendant the opportunity to rehabilitate 15 prospective jurors excused for cause pursuant to *Witherspoon v. Illinois*, 391 U.S. 510. Two were dismissed for reasons other than their views on capital punishment and the remaining 13 clearly and unequivocally stated that they were opposed to the death penalty and that their opposition to the death penalty would cause them to vote against its imposition under any circumstances. Defendant did not request an opportunity to rehabilitate any of the prospective jurors and only once took exception to a prospective juror's excusal; also, there was no showing that further questioning would have produced different answers.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

6. **Jury § 251 (NCI4th)— first-degree murder—peremptory challenges—Batson challenge**

There was no error in a first-degree murder prosecution in which the death penalty was sought in the State's use of peremp-

tory challenges to exclude nine African American jurors. Defendant neither objected nor sought to establish a *prima facie* case of racial discrimination and his failure to object precludes him from raising the issue on appeal.

**Am Jur 2d, Jury § 244.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

**Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.**

**7. Criminal Law § 756 (NCI4th); Jury § 139 (NCI4th)— first-degree murder—jury selection—prosecutor's definition of reasonable doubt—no error**

There was no error in a first-degree murder prosecution in which the death penalty was sought where defendant contended that the prosecutor misstated the definition of reasonable doubt during *voir dire* by stating that a reasonable doubt is one that is real and substantial and one which gives the jury substantial misgivings about the State's case. The North Carolina Supreme Court has consistently found no error in the use of the terms "substantial doubt" or "substantial misgivings" in a jury instruction defining reasonable doubt if the instruction as a whole properly conveys the concept of reasonable doubt. Furthermore, any misstatement was cured by the trial court's subsequent correct jury instruction.

**Am Jur 2d, Trial §§ 1374-1380.**

**8. Criminal Law § 76 (NCI4th)— first-degree murder—change of venue—publicity—denied**

There was no abuse of discretion in a first-degree murder prosecution in the trial court's denial of defendant's pretrial motion for a change of venue or a special venire based upon extensive publicity and coverage by the media where the trial court properly sustained the State's objection to the only evidence produced in support of defendant's motion, the testimony of a private investigator who had conducted a survey but who indicated that he had no formal training in statistics, that he had not determined the validity of the statistical sample, and that he could not say that a fair representation of the community was sur-

veyed, and who produced five newspaper articles, only two of which related to the present case and those were factual, informative, and noninflammatory in nature. Furthermore, defendant neither referred to the *voir dire* of the jurors who served nor argued that a juror objectionable to him sat on the jury and a review of the record reveals no basis upon which to conclude that any juror based his or her decision upon pretrial information rather than the evidence presented at trial.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

9. **Evidence and Witnesses § 339 (NCI4th)— first-degree murder—prior assaults on victim—admissible to show malice, intent, premeditation and deliberation**

The trial court did not abuse its discretion in a first-degree murder prosecution in the admission of testimony tending to show that defendant had previously assaulted the victim. The evidence tends to establish malice, intent, premeditation and deliberation, elements of first-degree murder, and tends to establish the defendant's ill will toward the victim, and thus is relevant to an issue other that defendant's character. Although defendant argues that the danger of unfair prejudice substantially outweighed the probative value of the disputed evidence, the exclusion of evidence under N.C.G.S. § 8C-1, Rule 403 is a matter generally left to the sound discretion of the trial court and abuse will be found only where the trial court's ruling is manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Homicide §§ 310, 311.**

10. **Evidence and Witnesses § 959 (NCI4th)— first-degree murder—statements by victim—afraid of defendant—state of mind exception to hearsay rule**

The trial court did not err in a first-degree murder prosecution in admitting hearsay statements by the victim that she was afraid of the defendant. The conversations between the victim and the five witnesses related directly to the victim's fear of defendant and were properly admitted pursuant to the state of mind exception to the hearsay rule to show the nature of the victim's relationship with the defendant and the impact of defend-

ant's behavior on the victim's state of mind prior to her murder. The trial court carefully weighed the probative value of the testimony against its prejudicial effect and defendant has not demonstrated any abuse of discretion. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Evidence §§ 666, 667.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed 170.**

**11. Evidence and Witnesses § 601 (NCI4th)— first-degree murder—letter by victim—authentication**

The trial court did not err in a first-degree murder prosecution by admitting into evidence a letter purportedly written by the victim where the victim's mother testified that she was familiar with her daughter's handwriting, that the letter was written in her daughter's handwriting, and that she recognized the signature as that of her daughter. There was sufficient evidence of authenticity. N.C.G.S. § 8C-1, Rule 901(a).

**Am Jur 2d, Evidence §§ 1381-1390.**

**12. Evidence and Witnesses § 959 (NCI4th)— first-degree murder—letter—hearsay—victim's fear**

The trial court did not err in a first-degree murder prosecution by admitting a letter from the victim where defendant contended that the letter was erroneously admitted under the residual exception to the hearsay rule, but the letter was admissible under the state-of-mind exception to show the status of the victim's relationship with defendant. N.C.G.S. § 8C-1, Rule 803(c).

**Am Jur 2d, Evidence §§ 666, 667.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed 170.**

**13. Evidence and Witnesses § 3126 (NCI4th)— first-degree murder—corroborating witness—hearsay**

The trial court did not err in a first-degree murder prosecution by admitting the testimony of one of the investigating officers, Deputy Williams, who testified concerning prior consistent

statements made by earlier witnesses where the prosecutor announced that the questioned testimony was being offered solely for the purpose of corroborating the earlier testimony. The fact that the testimony would otherwise be inadmissible hearsay will not prevent its admission for purposes of corroboration.

**Am Jur 2d, Witnesses §§ 1001-1005, 1011-1026.**

**14. Evidence and Witnesses § 2908 (NCI4th)— first-degree murder—corroborating witness—hearsay—door opened**

There was no error in a first-degree murder prosecution where the trial court admitted testimony by a detective regarding a statement made by the victim's mother concerning the victim's fear of defendant. Defendant concedes that the question was properly allowed for the purpose of showing that the statement was made, but asserts that the form of the question exceeded the scope for which the nonhearsay purpose allowed admission. The defendant opened the door to the introduction of any incompetent or irrelevant hearsay contained in the question by creating an inference during cross-examination that the victim was not afraid of the defendant.

**Am Jur 2d, Witnesses §§ 737-742.**

**15. Evidence and Witnesses § 755 (NCI4th)— first-degree murder—defendant's prior assault conviction—court files—no prejudice**

There was no prejudice in a first-degree murder prosecution where the trial court admitted court files relating to defendant's prior conviction for assault. The files were admitted for the nonhearsay purpose of showing motive, intent and plan and witnesses testified that defendant broke into the victim's home and attacked her, that the victim prosecuted the defendant for the assault and trespass, that the defendant harassed and threatened the victim, and that the victim believed that the defendant was going to kill her. The files added little, if anything, to the State's case.

**Am Jur 2d, Evidence §§ 408-410.**

**16. Evidence and Witnesses § 320 (NCI4th)— first-degree murder—drug use subsequent to crime—admitted for identification**

There was no error in a first-degree murder prosecution where the trial court admitted evidence that defendant had

bought forty to forty-five dollars' worth of crack cocaine with quarters, dimes and nickels where the victim's mother had testi-fied that the victim worked at a restaurant and received a large quantity of change from tips, that the victim had over one hun-dred dollars in quarters in a jar in her bedroom the night before her death, and that the jar was empty when she found the victim. The testimony was strong circumstantial evidence tending to show that defendant murdered the victim and stole her tip money from the jar in the bedroom and was relevant, admissible, and clearly not introduced for the purpose of showing that the defendant was a drug user.

**Am Jur 2d, Evidence §§ 452-457.**

**17. Evidence and Witnesses §§ 213, 221 (NCI4th)— first-degree murder—defendant's actions prior to and after murder**

The trial court did not err in a first-degree murder prosecu-tion by admitting testimony concerning defendant's actions prior to and after the murder where the testimony tends to implicate defendant in the theft of quarters missing from the victim's bed-room and therefore in the murder, and tends to show that defend-ant had the opportunity to carry out his threats to kill the victim on the night of the murder. Although defendant argued that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice, the defendant did not demonstrate any abuse of discretion.

**Am Jur 2d, Evidence §§ 525, 541, 542.**

**18. Evidence and Witnesses § 1694 (NCI4th)— first-degree murder—photographs of victim—admissible**

The trial court did not err in a first-degree murder prosecu-tion by admitting into evidence crime scene and autopsy pho-tographs where the crime scene photographs were received with limiting instructions and illustrated different aspects of the wit-ness' testimony. The autopsy photographs were also admitted with a proper limiting instruction, were not repetitive or exces-sive, and helped illustrate the medical examiner's testimony regarding the victim's injuries and cause of death.

**Am Jur 2d, Homicide §§ 416-419, 453; Trial § 507.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

**19. Criminal Law § 463 (NCI4th)— first-degree murder—prosecutor's argument—supported by evidence**

There was no error in a first-degree murder prosecution where defendant contended that the trial court erred in allowing the prosecutor to use inadmissible evidence during closing arguments, but all of the evidence of which defendant complains was properly admitted.

**Am Jur 2d, Trial § 554.**

**20. Criminal Law § 463 (NCI4th)— first-degree murder—prosecutor's argument—use of hearsay testimony**

There was no plain error in a first-degree murder prosecution where defendant contended that the trial court should have intervened *ex mero motu* where the prosecutor referred in closing arguments to the victim's statements of fear, her belief that the defendant was going to kill her, and her statements relating to the defendant's threats and prior assault. Although defendant contended that the prosecutor used the hearsay testimony admitted to show the victim's state of mind other than for the purpose admitted, the victim's statements were highly relevant to show the status of the victim's relationship with defendant and it was proper for the prosecutor to argue all reasonable inferences that may be drawn from this evidence. Clearly the victim's statements were relevant evidence from which the jury could conclude that the defendant intentionally killed the victim and that he had done so with malice, premeditation, and deliberation.

**Am Jur 2d, Trial § 554.**

**21. Criminal Law § 468 (NCI4th)— first-degree murder—prosecutor's argument—not grossly improper**

There was no error so grossly improper as to require the trial court's intervention *ex mero motu* in a first-degree murder prosecution where defendant argued that the prosecutor argued facts outside the record and expressed his own personal and highly prejudicial opinions, but the prosecutor's arguments fall well within the wide latitude accorded prosecutors in the scope of their argument and are consistent with and reasonably inferable from the record.

**Am Jur 2d, Trial § 554.**

**22. Criminal Law § 442 (NCI4th)— first-degree murder—prosecutor's argument—biblical references**

There was no error requiring intervention *ex mero motu* in a first-degree murder prosecution where defendant contended that the prosecutor improperly opened his closing argument with a biblical reference which indicated that the jury was ordained by God to condemn defendant, but, viewed in context, the prosecutor was effectively arguing that the evidence cried out that defendant perpetrated the crime even though it was committed in secret and without any witnesses. This is in no manner equivalent to saying that state law is divinely inspired or ordained by God.

**Am Jur 2d, Trial §§ 567, 568.**

**23. Criminal Law § 447 (NCI4th)— first-degree murder—prosecutor's argument—defendant's hatred of his father**

There was no error requiring intervention *ex mero motu* in a first-degree murder prosecution where defendant argued that the prosecutor improperly commented on the personal characteristics of the victim, but the argument was a reasonable inference drawn from the evidence.

**Am Jur 2d, Trial §§ 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

**24. Criminal Law § 468 (NCI4th)— first-degree murder—prosecutor's argument—right to remain silent, shifting burden of proof, presumption of innocence**

Portions of a prosecutor's closing argument in a first-degree murder case did not constitute a comment on defendant's exercise of his right to remain silent, a shifting of the burden of proof, or the deprivation of defendant's presumption of innocence, as defendant contended.

**Am Jur 2d, Trial §§ 554, 579, 580.**

**25. Criminal Law §§ 436, 465 (NCI4th)— first-degree murder—prosecutor's closing argument—decision from appellate courts**

There was no error in a first-degree murder prosecution where defendant contended that the prosecutor improperly encouraged the jury to convict the defendant on the basis of com-

munity sentiment and that the prosecutor's use of excerpts from decisions of the appellate courts confused and misled the jury.

**Am Jur 2d, Trial §§ 554, 569.**

**Prejudicial effect of prosecuting attorney's argument to jury that people of city, county, or community want or expect a conviction. 85 ALR2d 1132.**

26. **Criminal Law § 427 (NCI4th)— first-degree murder—prosecutor's argument—State's evidence not rebutted**

There was no error in a first-degree murder prosecution where defendant contended that the prosecutor's argument that the State's evidence was uncontradicted was an improper comment on his exercise of his right not to testify. It is well settled that the State may properly draw the jury's attention to the failure of the defendant to produce exculpatory evidence to contradict the State's case. The unavailability of a witness for the defense is not a determinative factor; theoretically, the evidence was contradictable by testimony of persons other than defendant or by cross-examination of the witnesses themselves.

**Am Jur 2d, Trial §§ 554, 579, 580.**

**Comment or argument by court or counsel that prosecution evidence is uncontradicted as amounting to improper reference to accused's failure to testify. 14 ALR3d 723.**

27. **Homicide § 552 (NCI4th)— first-degree murder—request for instruction on second-degree murder denied**

The trial court did not err in a first-degree murder prosecution by denying defendant's request to instruct the jury on second-degree murder as a lesser-included offense. The evidence supports a finding of premeditation and deliberation and evidence of the lesser-included offense was totally lacking. The fact that the defendant did not bring the murder weapon to the scene of the killing, without more, will not support an instruction of second-degree murder.

**Am Jur 2d, Homicide §§ 470, 471, 525.**

28. **Homicide § 253 (NCI4th)— first-degree murder—sufficiency of evidence—premeditation and deliberation**

The trial court did not err in a first degree murder prosecution by denying defendant's motion to set aside the verdict based

STATE v. ALSTON

[341 N.C. 198 (1995)]

upon insufficient evidence of premeditation and deliberation where the victim did not provoke the defendant in any manner; the defendant harassed, threatened and assaulted the victim prior to the murder; the victim was rendered helpless by being bludgeoned in the face with a hammer-like instrument; and the killing was without question done in a brutal manner.

**Am Jur 2d, Homicide §§ 452, 501.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

**29. Criminal Law § 468 (NCI4th)— first-degree murder—sentencing phase— prosecutor's argument—victim's state of mind—no error**

There was no error in the sentencing phase of a first-degree murder prosecution in the court's decision not to intervene *ex mero motu* in the prosecutor's closing argument where defendant contended that the prosecutor improperly used hearsay testimony introduced to show the victim's state of mind to argue that defendant planned the crime and did not act under emotional disturbance, that defendant had a significant history of criminal activity, and that the murder was committed in retaliation for the victim's testimony against defendant in an earlier trial for assault. Other than unsupported allegations of impropriety, defendant fails to show how the arguments were improper or how the trial court abused its discretion by not intervening.

**Am Jur 2d, Trial §§ 554, 569, 664.**

**30. Criminal Law § 462 (NCI4th)— first-degree murder—sentencing phase—prosecutor's argument—not outside record**

There was no error requiring intervention *ex mero motu* in the sentencing phase of a first-degree murder prosecution where defendant contended that the prosecutor improperly argued facts outside the record and expressed his own personal and prejudicial opinions. The evidence clearly established that the cause of the victim's death was asphyxiation and there was no reasonable possibility that the use of the word "choked" rather than "suffocated" confused the jury. The argument that defendant did not lose his temper is a permissible inference drawn from the facts, the statement that defendant took matters into his own hands was nothing more than an expression that defendant took things

into his own hands by killing the victim, and the argument that the State had proven its case beyond a reasonable doubt was a permissible statement of the State's position.

**Am Jur 2, Trial §§ 554, 569.**

31. **Criminal Law § 427 (NCI4th)— first-degree murder—sentencing phase—prosecutor's argument—defendant's failure to testify**

There was no abuse of discretion in the trial court's failure to intervene in the sentencing phase of a first-degree murder prosecution where defendant contended that the prosecutor commented in his closing argument on his failure to testify, but the argument, when read in context, although less than clear, appears to refer to a state trooper not testifying rather than defendant. Assuming that the prosecutor's argument was improper, the impropriety was not so gross or excessive that the trial court abused its discretion by not intervening *ex mero motu*.

**Am Jur 2d, Trial §§ 554, 579, 580.**

32. **Criminal Law § 465 (NCI4th)— first-degree murder—sentencing phase—prosecutor's argument—inaccurate statement of law**

There was no reversible error in a first-degree murder sentencing hearing where defendant contended that the prosecutor inaccurately stated the law as to the statutory aggravating circumstances submitted by the court and as to defendant's burden of proof regarding mitigating circumstances. The defendant fails to point to any particular statement by the prosecutor which he contends misstated the law and did not cite any authority showing that a particular statement was incorrect. Any misstatement of the law would have been cured by the trial court's proper instructions to the jury.

**Am Jur 2d, Trial §§ 640, 641, 643.**

33. **Criminal Law § 454 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—pause to show time for death by asphyxiation—no error**

There was no error in a first-degree murder sentencing hearing where defendant argued that the court erred by not intervening *ex mero motu* to prevent the prosecutor's three minute pause intended to show the period of time it took for the victim to die

of asphyxiation. The evidence clearly established that the defendant forcibly held the victim's head down into a pillow for at least three or four minutes, the length of time it took for the victim to die of asphyxiation is relevant to the character and circumstances of the crime regardless of whether the victim suffered, and defendant failed to object to the prosecutor's argument. In light of *State v. Artis*, 325 N.C. 278, there was no impropriety whatsoever with the prosecutor's argument and no error in the decision not to intervene.

Am Jur 2d, Trial §§ 547 et seq., 554, 569.

**34. Criminal Law § 468 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—sympathy for defendant's family**

The trial court did not abuse its discretion by not intervening *ex mero motu* in a first-degree murder sentencing hearing where defendant contended that the prosecutor acted improperly by requesting that the jury not consider sympathy for defendant's family in its consideration of mitigating circumstances. It is clear that, when read in context, the prosecutor was not asking the jurors to ignore any feelings of sympathy that are supported by the facts, but was arguing that their duty nevertheless required them to recommend the death penalty.

Am Jur 2d, Trial §§ 648, 649.

**35. Criminal Law § 442 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—jury's responsibility**

There was no error in a first-degree murder sentencing hearing where defendant argued that the prosecutor's argument diminished the jury's sense of responsibility for determining the appropriateness of death because the prosecutor argued that the jurors had a duty, under the evidence presented, to recommend the death penalty and that they were servants of the law. The prosecutor did not suggest to the jurors that they could depend upon judicial or executive review to correct any errors they might make.

Am Jur 2d, Trial §§ 567 et seq.

**STATE v. ALSTON**

[341 N.C. 198 (1995)]

**36. Criminal Law § 455 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—deterrent value**

There was no error in a first-degree murder sentencing hearing where defendant contended that the trial court erred by failing to sustain his objection to the prosecutor's comments on the relative deterrent values of life imprisonment and the death penalty and allegedly racist remarks. The argument that the death penalty was the only way to be sure that this defendant would never walk out again was a permissible argument that the jury should recommend the death penalty to foreclose further crimes by the defendant and the prosecutor's subsequent argument that it is hard to be penitent with televisions, basketball courts, and weight rooms emphasized the prosecution's position that life in prison was not an adequate punishment. Although defendant contended that a comment concerning "sitting around rapping" encouraged the jury to make its decision on the basis of racial prejudice, the common definition of rap is to talk and defendant presented no argument to convince the Court that rap as used by the prosecutor meant anything else. There was no violation of defendant's First Amendment rights because, regardless of whether the prosecutor intended rap to mean talk or sing, he did not argue that defendant should be put to death because he rapped.

**Am Jur 2d, Homicide §§ 463, 464; Trial §§ 572, 658 et seq.**

**37. Criminal Law § 458 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—duration of life sentence**

There was no gross impropriety requiring the trial court to intervene *ex mero motu* in a first-degree murder sentencing hearing where defendant contended that the court erred by failing to prevent the prosecutor's innuendo that the duration of a life sentence would be minimal when he would not be eligible for parole for twenty years. The prosecutor argued that the jury should impose the death penalty in order to insure that the defendant never kills again; there is no manner in which the argument could be construed to address the defendant's parole eligibility.

**Am Jur 2d, Trial §§ 575, 576.**

**Prejudicial effect of statement of prosecutor as to possibility of pardon or parole. 16 ALR3d 1137.**

**38. Criminal Law § 1343 (NCI4th)— first-degree murder—sentencing—aggravating circumstances—especially heinous, atrocious or cruel**

There was sufficient evidence in the sentencing hearing for a first-degree murder to submit the aggravating circumstance that the murder was especially heinous, atrocious, or cruel where the evidence supported a conclusion that the killing was physically agonizing, conscienceless, pitiless and unnecessarily dehumanizing to the victim and a finding that the killing involved psychological terror not normally present in murder. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**39. Criminal Law §§ 1341, 1342 (NCI4th)— first-degree murder—sentencing—aggravating circumstances—pecuniary gain, former witness who exercised official duty**

The evidence was sufficient in a sentencing hearing for first-degree murder to submit the aggravating circumstances of pecuniary gain and that the murder was committed against a former witness against the defendant because of the exercise of her official duty. The victim was found dead two days after testifying against defendant, over one hundred dollars in change was stolen from the victim's bedroom, and witnesses testified that defendant was making purchases with change shortly after the murder. Any error in submitting these aggravating circumstances was harmless because, based on the jury finding that the murder was especially heinous, atrocious, or cruel and the jury not finding any mitigating circumstances, it is unreasonable to believe that the jury would have ignored the fact that the defendant mercilessly and brutally killed the victim and thus would have found that the death penalty was not justified absent a finding that the victim was a former witness or that the defendant killed the victim for money.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**40. Criminal Law § 1355 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—no significant history of prior criminal activity**

There was no error in the sentencing hearing for a first-degree murder where defendant argued that the jury was required to find the existence of the statutory mitigating circumstance that

STATE v. ALSTON

[341 N.C. 198 (1995)]

defendant did not have a significant history of prior criminal activity given the uncontradicted evidence, but evidence regarding defendant's prior assault on the victim was susceptible to a finding by the jury that the defendant had a significant history of criminal activity. In those cases where the evidence is truly uncontradicted, the defendant is at most entitled to a peremptory instruction when he requests it and the defendant did not request a peremptory instruction in this case. The mitigating circumstance was submitted, the jury was required to consider it, and the jury simply declined to find that the evidence supported this mitigating circumstance.

Am Jur 2d, Criminal Law §§ 598, 599.

**41. Criminal Law § 1363 (NCI4th)— first-degree murder—sentencing—nonstatutory mitigating circumstances**

There was no error in the sentencing hearing for a first-degree murder prosecution where the jury did not find the nonstatutory mitigating circumstances that defendant was regularly employed at the time of the offense and that defendant has a supportive family structure. It is the prerogative of the jury to believe or reject the evidence presented by the defendant as to the existence of a mitigating circumstance and the jury may determine that a nonstatutory mitigating circumstance has no value even if that circumstance is found to exist.

Am Jur 2d, Criminal Law §§ 598, 599.

**42. Criminal Law § 1363 (NCI4th)— first-degree murder—sentencing—nonstatutory mitigating circumstances—instructions**

The trial court in a first-degree murder prosecution did not err by instructing the jury that it must determine whether the evidence supported each nonstatutory mitigating circumstance submitted and whether it had mitigating value.

Am Jur 2d, Criminal Law §§ 598, 599.

**43. Criminal Law § 1327 (NCI4th)— first-degree murder—sentencing—duty to recommend death**

The trial court did not err in a first-degree murder prosecution by instructing the jury that it had a duty to recommend a sentence of death if it determined that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and

that the aggravating circumstances were sufficiently substantial to warrant the imposition of the death penalty.

**Am Jur 2d, Trial §§ 841, 1446, 1447.**

**44. Constitutional Law § 371 (NCI4th)— death penalty— constitutional**

The North Carolina death penalty statute is constitutional.

**Am Jur 2d, Criminal Law § 628.**

**45. Criminal Law § 1343 (NCI4th)— first-degree murder—sentencing—especially, heinous, atrocious or cruel aggravating circumstance—not inherently vague**

The instruction for the especially heinous, atrocious or cruel aggravating circumstance is not inherently vague.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**46. Criminal Law § 1348 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—instructions**

The instruction on mitigating circumstances in a first-degree murder sentencing hearing did not erroneously focus the jury's attention on the killing, thereby limiting their ability to consider defendant's character and background as a basis for a sentence less than death.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**47. Criminal Law § 1351 (NCI4th)— first-degree murder—instructions—burden of proof**

The trial court in a first-degree murder sentencing hearing did not err when instructing the jury on defendant's burden of proof by defining preponderance of the evidence as evidence which "must satisfy you" rather than as "more likely than not."

**Am Jur 2d, Evidence § 171.**

**48. Homicide § 493 (NCI4th)— first-degree murder—instructions—premeditation and deliberation—lack of provocation**

There was no error in a first-degree murder prosecution where the trial court instructed the jury that premeditation and deliberation could be inferred from lack of provocation by the victim.

**Am Jur 2d, Homicide §§ 482, 483, 501.**

STATE v. ALSTON

[341 N.C. 198 (1995)]

**49. Criminal Law § 1363 (NCI4th)— first-degree murder— mitigating circumstances—instructions—circumstantial evidence**

The trial court did not err in a first-degree murder prosecution by refusing to submit as a nonstatutory mitigating circumstance that the State's case was largely based upon circumstantial evidence.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**50. Criminal Law § 1373 (NCI4th)— first-degree murder— death sentence—not disproportionate**

A sentence of death for a first-degree murder was not disproportionate where the record fully supports the aggravating circumstances found by the jury, there is no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and the sentence was not excessive or disproportionate to the penalty imposed in similar cases. The distinguishing characteristics of the case are that the jury convicted defendant under the theory of premeditation and deliberation; the victim's brutal murder was found by the jury to be especially heinous, atrocious, or cruel; the victim was killed in her own bedroom during the night; the victim suffered great physical and psychological pain before death; the victim was not only in pain, but was aware of her impending death as she suffocated; the victim was of unequal physical strength to defendant; the victim feared defendant; and the defendant failed to exhibit remorse after the killing.

**Am Jur 2d, Criminal Law § 628.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Allen (J.B., Jr.), J., at the 19 October 1992 Criminal Session of Superior Court, Warren County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 14 February 1995.

*Michael F. Easley, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*Joseph B. Cheshire, V and Robert Manner Hurley for defendant-appellant.*

STATE v. ALSTON

[341 N.C. 198 (1995)]

LAKE, Justice.

The defendant was indicted on 28 May 1991 for the first-degree murder of Pamela Renee Perry. The defendant was tried capitally, and the jury found the defendant guilty of first-degree murder on the theory of premeditation and deliberation. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death. For the reasons discussed herein, we conclude that the jury selection and the guilt and sentencing phases of defendant's trial were free from prejudicial error, and that the sentence of death is not disproportionate.

At trial, the State presented evidence tending to show that Pamela Perry died sometime during the late evening hours of 30 November 1990 or the early morning hours of 1 December 1990. Vonceil Perry, the victim's mother, discovered her daughter's body on the morning of 1 December 1990 after returning home from work. Ms. Perry testified that when she first saw her daughter, her daughter was lying face down on a pillow in her daughter's bedroom. When Ms. Perry lifted her daughter's head, she observed that the victim's face had been beaten severely.

Dr. John D. Butts, the Chief Medical Examiner for the State of North Carolina, testified that he performed an autopsy on the victim on 1 December 1990. Dr. Butts' testimony revealed that the victim received a number of blunt-force injuries to her face. He stated that the victim suffered substantial bruising and swelling over her entire face and neck, bruising and lacerations to her right eye, bruising on the left side of her neck, a tear in the skin at the corner of her mouth, a series of tears in the skin on the right cheek, tears in the skin on her left ear, tears to the skin along the left side of her jaw which were approximately one inch deep, a tear to the inner surface of her lip, and several scrapes and abrasions. Dr. Butts' internal examination disclosed blood over the surface of the brain, resulting from the blows to the face, and hemorrhaging inside the victim's neck, larynx, and trachea. The victim also had bruises and bleeding in the eyes. Dr. Butts testified that these injuries were caused by a blunt, hard object, having two edges or prongs which could break the skin and produce parallel scrapes. Dr. Butts opined that a hammer found on the victim's bed could have caused the injuries to the victim's face.

Dr. Butts further testified that the victim did not die as a result of the blunt-force injuries, but died as a result of asphyxiation or suffocation. Dr. Butts did, however, testify that the victim was alive when

STATE v. ALSTON

[341 N.C. 198 (1995)]

she received the blunt-force injuries. Dr. Butts testified that in his opinion, a pillow could have been used to suffocate the victim, and that it normally took at least three to four minutes for a person to suffocate. Dr. Butts further opined that the victim could not have suffocated by merely lying face down in the pillow, but would have to have been forced down into the pillow.

Vonceil Perry's testimony revealed that the defendant and the victim had been dating each other for approximately one year. However, at some point in time prior to the murder, difficulties arose between the victim and the defendant. Ms. Perry was allowed to testify, over defendant's objection, that her daughter had been receiving threatening phone calls from the defendant. Specifically, Ms. Perry stated that her daughter told her that the defendant kept telling her (the victim) that she had a beautiful face and that he would hate to have to "smash it in" and "mess [it] up." As a result of the phone calls, the victim filed a complaint with the Warren County Sheriff's Department. Deputy Sean Brake, the deputy who took the complaint, testified that the victim indicated that the caller sounded like the defendant and had threatened to kill her during one of the phone calls.

Ms. Perry further testified that her daughter was a waitress and received a large quantity of quarters from tips earned on her job. Most of the coins had been rolled and placed in a large jar on a table in the victim's bedroom. When the victim's body was discovered, the jar was found empty at the edge of the victim's bed. The night of her death, the victim had more than one hundred dollars' worth of change in the jar.

Brenda Turner testified that she worked at Willoughby's Convenience Store on 1 December 1990, and that the defendant came into Willoughby's at approximately 11:00 p.m. that night and purchased gas and a soft drink with quarters. Ms. Turner stated that defendant's total expenditure was four or five dollars. Sherry Jiggetts testified that she knew the defendant, and that defendant came to her house and purchased forty to forty-five dollars' worth of crack cocaine. Ms. Jiggetts testified that the defendant paid for the drugs with change consisting of quarters, dimes and nickels. Although she could not remember at trial when this transaction occurred, she acknowledged that she had previously given a statement to the police that this transaction occurred within a week of the murder. Another witness, Phyllis Alexander, testified that she lived with Ms. Jiggetts

and that around the time of the murder, the defendant came to her house and wanted to exchange about forty to forty-five dollars in quarters for cash.

Other testimony revealed that on a separate occasion, the defendant broke into the victim's home and assaulted her and a friend. During this incident, the defendant struck the victim in the head approximately three times. The defendant was charged with assault, and the victim testified against defendant at the assault trial. The defendant was found guilty, placed on probation and ordered to pay for the victim's medical bills. Two days later, the victim was found dead.

The defendant moved to dismiss at the close of the State's evidence. The trial court denied the motion. The defendant presented no evidence during the guilt phase of the trial.

At the penalty phase of trial, the defendant called five witnesses in an attempt to establish a factual basis for the statutory and nonstatutory circumstances he requested be submitted to the jury. The State did not present any additional evidence.

Three aggravating circumstances were submitted to the jury: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed against a former witness; and (3) the murder was committed for pecuniary gain. Three statutory mitigating circumstances and three nonstatutory mitigating circumstances were also submitted to the jury. The statutory mitigating circumstances included: (1) no significant history of prior criminal activity; (2) capital felony committed while the defendant was under the influence of emotional or mental disturbance; and (3) any other circumstances arising from the evidence. The nonstatutory mitigating circumstances submitted were: (1) the defendant has a good reputation in the community; (2) the defendant was regularly employed at the time of the offense; and (3) the defendant has a supportive family structure. The jury found the existence of all three aggravating circumstances and declined to find the existence of any of the six mitigating circumstances. Consequently, the jury found that the aggravating circumstances outweighed the mitigating circumstances and recommended a sentence of death.

**STATE v. ALSTON**

[341 N.C. 198 (1995)]

PRETRIAL/JURY SELECTION

I.

[1] The defendant first assigns error to the trial court's denial of his motion to permit *voir dire* of potential jurors regarding their beliefs about parole eligibility. The defendant, relying on *Simmons v. South Carolina*, —— U.S. ——, 129 L. Ed. 2d 133 (1994), argues that the trial court's restriction during *voir dire* prevented defense counsel from identifying and educating those potential jurors who held erroneous beliefs regarding parole eligibility and, thus, effectively concealed accurate sentencing information from the jurors ultimately selected. This Court, however, has previously held that information regarding parole eligibility is not relevant to the issues at trial and is not a proper matter for the jury to consider in a capital sentencing proceeding. *See State v. McNeil*, 324 N.C. 33, 44, 375 S.E.2d 909, 916 (1989), *sentence vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991).

*Simmons* does not affect our prior rulings on this issue. In *Simmons*, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons*, —— U.S. at ——, 129 L. Ed. 2d at 138. The Supreme Court, however, acknowledged the rule stated in *California v. Ramos*, 463 U.S. 992, 1014, 77 L. Ed. 2d 1171, 1189 (1983), that when the defendant is eligible for parole, it is ultimately for the states to determine whether and under what circumstances juries are to be instructed regarding the availability of parole. *Simmons*, —— U.S. at ——, 129 L. Ed. 2d at 145. Unlike the defendant in *Simmons*, the defendant in the case *sub judice* would have been eligible for parole had he received a life sentence. This Court has consistently rejected the argument that *Simmons* requires North Carolina juries be informed as to the length of time a defendant must serve before becoming eligible for parole. *See State v. Price*, 337 N.C. 756, 763, 448 S.E.2d 827, 831 (1994) (*Simmons* limited to those situations where the alternative to a sentence of death is life imprisonment without the possibility of parole), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 224, *reh'g denied*, —— U.S. ——, 131 L. Ed. 2d 879 (1995). Consistent with prior decisions of this Court, we decline to expand *Simmons* to cases involving parole-eligible defendants. Accordingly, this assignment of error is overruled.

STATE v. ALSTON

[341 N.C. 198 (1995)]

## II.

The defendant next assigns error to (1) the trial court's denial of his motion to prohibit death qualification *voir dire* questions; (2) the State's use of peremptory challenges to excuse jurors not meeting the standard for excusal for cause under *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985) and *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, *reh'g denied*, 393 U.S. 898, 21 L. Ed. 2d 186 (1968); and (3) the trial court's excusal for cause of three prospective jurors based on their responses to death-qualification questions.

**[2]** The defendant first asserts that the trial court erred by denying his motion to prohibit death-qualification questioning during *voir dire*. The defendant argues that death qualification of the jury results in a jury that is biased in favor of the State and is predisposed to convict. Defendant further argues that the process of death qualification deprived him of his right to due process and to a trial by an impartial jury drawn from a representative cross-section of the community. We have repeatedly rejected these arguments and likewise do so here. *See State v. Oliver*, 309 N.C. 326, 336-37, 307 S.E.2d 304, 312-13 (1983); *State v. Avery*, 299 N.C. 126, 137-38, 261 S.E.2d 803, 810 (1980).

**[3]** The defendant next contends that the State's use of peremptory challenges to remove prospective jurors who were not excludable for cause under *Wainwright* and *Witherspoon* but who wavered in their ability to impose the death penalty violated his constitutional rights. This Court has previously rejected defendant's argument, holding that a prosecutor's use of peremptory challenges to excuse veniremen expressing qualms about the death penalty violates neither the federal nor the state Constitution even though the jurors could not have been excused for cause because of those concerns. *State v. Williams*, 339 N.C. 1, 22, 452 S.E.2d 245, 258 (1994), *cert. denied*, —— U.S, ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3242 (1995); *see also State v. Allen*, 323 N.C. 208, 222, 372 S.E.2d 855, 863 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 331 N.C. 746, 417 S.E.2d 227 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 775, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993). The defendant has presented no argument to convince us that the prior decisions of this Court are incorrect.

**[4]** Finally, the defendant argues that under *Wainwright* and *Witherspoon*, it was error for the trial court to dismiss prospective jurors Reid, Richardson and Marrow for cause based upon their opposition to capital punishment. In *Witherspoon*, the Supreme Court held

that a prospective juror may not be excused for cause simply because he "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 20 L. Ed. 2d at 784-85. However, a juror may be excused for cause if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52. Further, jurors may be properly excused if they are unable to " 'state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993) (emphasis omitted) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986)).

When questioned by the prosecutor, prospective juror Reid stated that he was opposed to the death penalty and that he did not think he could vote for the death penalty. Following the prosecutor's challenge for cause, Reid was questioned by the trial court, and the following exchange took place:

COURT: Mr. Reid, I want to ask you some questions to be sure I understand your answers. For my clarification did you say that you are opposed to the death penalty?

JUROR: Yes, sir.

COURT: Would you consider that a strong opposition to the death penalty?

JUROR: Yes.

COURT: And did I understand you to say that you could not vote to impose the death penalty under any circumstances?

JUROR: Yes, sir; that's right.

Reid's responses indicated with unmistakable clarity that his bias against the death penalty would substantially impair his ability to perform his duties as a juror. Therefore, we conclude that the trial court did not err by granting the State's motion and excusing Reid for cause.

Prospective jurors Richardson and Marrow also indicated that they were opposed to the death penalty. Both jurors stated, unequivocally at times, that their views on the death penalty would substantially impair their ability to follow the law. At other times, each juror vacillated when asked whether she could set aside her beliefs and

vote for the death penalty. Neither Richardson nor Marrow was able to state clearly her willingness to temporarily set aside her own beliefs in deference to the rule of law. This Court has recognized "that a prospective juror's bias may not always be 'provable with unmistakable clarity,'" and in such instances, "'reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially.'" *Brogden*, 334 N.C. at 43, 430 S.E.2d at 908 (quoting *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990)). After a thorough review of the exchange between the prosecutor, counsel for the defendant, the trial court and each juror, we cannot say that the trial court abused its discretion in determining that the views of prospective jurors Richardson and Marrow would prevent or substantially impair them from performing their duties as jurors. Deferring to the trial court's judgment, we find no error in excusing, for cause, prospective jurors Richardson and Marrow. This assignment of error is overruled.

III.

[5] The defendant next assigns error to the trial court's refusal to afford him an opportunity to rehabilitate fifteen prospective jurors excused for cause pursuant to *Witherspoon*. We find no error with respect to any of the jurors.

We first note that two of the jurors were dismissed for reasons other than their views on capital punishment. Juror Seward was peremptorily excused by the defense. Juror Williams was excused for cause after it became apparent to the trial court that she had been very sick with the measles and encephalitis, and that she did not understand the proceedings. The jury *voir dire* reveals that the defendant did not object to Williams' excusal, and that the excusal was with the consent of all parties. Clearly, there is no error with respect to jurors Seward and Williams.

Under questioning by the prosecutor and the trial court, the remaining thirteen jurors clearly and unequivocally stated that they were opposed to the death penalty, and that their opposition to the death penalty would cause them to vote against its imposition under any circumstances. It is well established that "[t]he defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court." *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). We note further that the defendant did

not request an opportunity to rehabilitate any of the prospective jurors, and only once did defendant take exception to a prospective juror's excusal. In the absence of any such request, and there being no showing that further questioning by the defendant would have produced different answers, it was not error for the trial court to deny defendant the opportunity to question the prospective jurors further. This assignment of error is overruled.

IV.

**[6]** By his next assignment of error, defendant contends that the State exercised its peremptory challenges to exclude nine black jurors on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). Specifically, defendant claims that the trial court should have intervened *ex mero motu* to prevent the State from excusing these jurors. We disagree.

In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of peremptory challenges to exclude a juror solely on account of his or her race. *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83. The Supreme Court established a three-part test to determine if a prosecutor has impermissibly excluded a juror based on race. First, *the defendant must* establish a *prima facie* case of purposeful discrimination. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88; *State v. Robinson*, 330 N.C. 1, 15, 409 S.E.2d 288, 296 (1991). If the defendant succeeds in establishing a *prima facie* case of discrimination, the burden shifts to the prosecutor to offer a race-neutral explanation for each challenged strike. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88; *State v. Wiggins*, 334 N.C. 18, 31, 431 S.E.2d 755, 763 (1993). The prosecutor's explanation need not, however, rise to the level justifying a challenge for cause. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. Finally, the trial court must determine whether the defendant has proven purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991).

In each of the nine instances where defendant contends the trial court erred, the defense neither objected nor sought to establish a *prima facie* case of racial discrimination. Defendant's failure to object to the prosecutor's challenges precludes him from raising this issue on appeal. *State v. Adams*, 335 N.C. 401, 411, 439 S.E.2d 760, 765 (1994). We must assume that defendant, through counsel, was familiar with *Batson* but elected not to raise the issue at trial, because he did not in fact believe the State was exercising its peremptory chal-

lenges in a discriminatory manner. Defendant's assignments of error on these grounds are accordingly overruled.

## V.

**[7]**  By his next assignment of error, the defendant contends that the prosecutor misstated the definition of "reasonable doubt," thereby diminishing the State's burden of proof below the standard mandated by the United States Constitution. The defendant specifically contends that the prosecutor's statements during jury *voir dire*, that a reasonable doubt is one that is "real and substantial" and one which gives the jury "substantial misgivings about the State's case," were so grossly improper that the trial court erred by failing to intervene *ex mero motu.*

We first note that the defendant has cited no authority in support of his argument that the prosecutor misstated the law during jury *voir dire.* Pursuant to Rule 28(b)(5) of the North Carolina Rules of Appellate Procedure, an assignment of error is deemed abandoned if the defendant fails to cite reasonable authority in its support. *See State v. Bonney,* 329 N.C. 61, 82, 405 S.E.2d 145, 157 (1991).

Assuming, *arguendo,* that this assignment of error is not abandoned by the defendant's failure to cite reasonable authority, we find no error, constitutional, plain or otherwise, with the prosecutor's statements. This Court has consistently found no error in the use of the terms "substantial doubt" or "substantial misgivings" in a jury instruction defining reasonable doubt, if the instruction, as a whole, properly conveys the concept of reasonable doubt. *See State v. Taylor,* 340 N.C. 52, 60, 455 S.E.2d 859, 863 (1995); *State v. Bryant,* 337 N.C. 298, 306, 446 S.E.2d 71, 75-76 (1994). We similarly find no error in the use of these terms during jury selection. Further, any misstatement in the law by the prosecutor was cured by the trial court's subsequent correct jury instruction defining reasonable doubt. *See State v. Dodd,* 330 N.C. 747, 755, 412 S.E.2d 46, 50 (1992). This assignment of error is overruled.

## VI.

**[8]**  By his next assignment of error, the defendant contends that the trial court erred in denying his pretrial motion for a change of venue or, in the alternative, a special venire. Defendant asserts that extensive publicity, coverage of the murder by the media, and the potential for bias precluded his receiving a fair trial in Warren County.

STATE v. ALSTON

[341 N.C. 198 (1995)]

In order to obtain a change of venue or a special venire, the burden is on the defendant to prove prejudice so great that he cannot obtain a fair and impartial trial. *State v. Jerrett*, 309 N.C. 239, 251, 307 S.E.2d 339, 345 (1983). Stated otherwise, a defendant must show a reasonable likelihood that the prospective jurors will base their decision in the case upon pretrial information rather than the evidence presented at trial and will be unable to remove from their minds any preconceived impressions they might have formed. *Id.* at 255, 307 S.E.2d at 347. This determination is addressed to the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a gross abuse of discretion. *State v. Gardner*, 311 N.C. 489, 497, 319 S.E.2d 591, 598 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). Our review of the record reveals that the defendant has shown no abuse of discretion in the trial court's denial of the motion for change of venue or special venire.

At the hearing on the motion, the only evidence produced in support of defendant's motion was the testimony of private investigator Larry Mitchell. Mitchell testified that he had conducted a survey which revealed that 17 percent of the individuals surveyed either knew or had heard of the decedent and that 22 percent of those surveyed had read or heard about the case. Upon the State's objection to the survey, the trial court allowed Mitchell's *voir dire*, during which Mitchell indicated that he had no formal training in the field of statistics, that he had not determined the validity of the statistical sample, and that he could not say that a fair representation of the community was surveyed. The State's objection was properly sustained, and the survey results were not admitted into evidence. In addition to the survey results, Mitchell produced five newspaper articles, of which only two related to the present case. These articles were shown to be factual, informative and noninflammatory in nature. Standing alone, factual news accounts regarding the commission of a crime and the pretrial proceedings do not warrant a change of venue. *Gardner*, 311 N.C. at 498, 319 S.E.2d at 598.

Further, we have held that when a defendant alleges prejudice as a result of pretrial publicity, he must show that he exhausted his peremptory challenges and that a juror objectionable to defendant on this ground sat on the jury. *Jerrett*, 309 N.C. at 255, 307 S.E.2d at 347-48. In the case *sub judice*, the defendant has neither referred to the *voir dire* of the jurors who served nor has he argued that a juror objectionable to him sat on the jury. Our review of the record reveals no basis upon which to conclude that any juror based his or her deci-

sion upon pretrial information rather than the evidence presented at trial. Of the twelve jurors hearing defendant's case, ten had never heard of the case before serving on the jury. The remaining two jurors had either read or heard something about the case but had no recollection of what they had read or heard, had formed no opinions about the case or knew of no reason why they could not be fair and impartial. We accordingly overrule this assignment of error.

## GUILT/INNOCENCE PHASE

### VII.

**[9]** The defendant's seventh assignment of error concerns the admissibility of evidence tending to show that the defendant had assaulted the victim in this case approximately one month before her murder. Defendant contends that the trial court committed reversible error by allowing the State to present the following evidence: (1) testimony of Curtis Hymon, a friend of the victim's; (2) testimony of James Hayes, the defendant's probation officer; (3) testimony of Johnny Williams, a deputy with the Warren County Sheriff's Department; (4) court files charging the defendant with the prior assault on the victim, trespass and first-degree burglary; and (5) a letter written by the victim describing the prior assault.

Curtis Hymon testified for the State that he witnessed defendant assault and injure the victim on the night of 20 October 1990. Specifically, Mr. Hymon testified that while he was watching a movie with the victim, they heard a knock on the door. The victim indicated that she knew who was at the door. They heard another knock and then a loud "boom," at which time the defendant came into the room, stood over the victim and stated, "What the hell is going on?" Mr. Hymon testified that the defendant then slapped the victim.

James Hayes, defendant's probation officer, testified for the State that defendant was convicted for the 20 October 1990 assault and that defendant was ordered to pay restitution to the victim in the amount of her medical bills. Mr. Hayes further testified that he met with the victim to discuss her medical bills, and during his meeting with the victim, she informed him that she was receiving threatening phone calls from someone she believed to be the defendant.

Johnny Williams, a deputy with the Warren County Sheriff's Department, testified for the State that he went to the victim's residence on 20 October 1990 to investigate defendant's assault upon the victim, and that he took statements from Curtis Hymon and the vic-

tim. Deputy Williams testified that he was told by Curtis Hymon that defendant kicked in the victim's door, and that he (Hymon) and the defendant got in a fight. Deputy Williams further testified that he was told by the victim that she and Mr. Hymon were sitting in the bedroom when she heard a knock and then heard the door being kicked in and that defendant came through the door and then "hit her upside the head" three times, causing a severe headache. Deputy Williams also testified that the victim had a "knot" on her head and that her hair was "all tore up."

The State also introduced into evidence court files indicating that the defendant was charged with the 20 October 1990 assault on the victim, first-degree trespass, and first-degree burglary, and a letter written by the victim to her congressman describing the assault. The letter reads as follows:

Dear Mr. Congressman,

My name is Pamela Perry and I am 25 years of age, single, with no children. On the nite [sic] of October 20, 1990, I was in my home with a friend when my house was broke into. His name is Charlie Mason Alston, Jr. This is my story:

Mr. Alston knocked at my door and I refused to answer the knock. It was about 11:15 p.m. that nite [sic], and my mother had gone to work. A few seconds later, he broke in my front door and made his way to my bedroom. In my bedroom my friend and myself were in the process of getting ready to watch a VCR tape that I had rented. Mr. Alston's first words were "what in hell is this?" Mr. Alston and I had a thing going on in the past, but regardless, he didn't have the right to enter my home. Once he entered my room, he pushed me into my T.V. and I fell backwards. My friend was cornered and beatened [sic]. When I got to my feet, I tried to get him off. Finally Mr. Alston left and I phoned the police and my friend contacted a member of his family. He then went to the bathroom to clean his face and I was on the floor putting on my shoes waiting for the police officer. Mr. Alston came back to my home, this time with a large stick. He went for my friend once again but, I grabbed Mr. Alston begging him to leave. My friend ran out upon my request. Mr. Alston then struck me several times in my living room. I really didn't think he would strike me again, but I was wrong. He beat me over my head with his fists and struck me with his stick. I finally broke away and ran out my back door. He replied, "Daddy can't help you now." My father is dead.

Someone from your office helped us get my sister here from Germany in 1989. We still have the sympathy letter that was sent. My point is, we had gone to court but my friend wasn't present. I wasn't able to tell my story. True enough, he's paying all doctor bills and is on probation for 5 years, but the system isn't fair. I never had a chance to tell my story. I was told if he had gotten any time he would have been out within 30 days. The system didn't give me a chance. He lives walking distance from me. We live in a very small town. I'm being treated as tho [sic] I asked him to beat me. I wasn't put here for a punching bag. All I want is satisfaction. The system is saying it's alright [sic] to beat a woman. A simple open and closed case makes me feel like a victim forever. Is there anything I can do? I don't have money the way his family do [sic].

All I have is my mom and her support. When I close my eyes at nite [sic], I see Mr. Alston coming into my room. After this offense, I wasn't able to sleep in my own house. My mother works nights, and she worries. I work days. I am a 25 year old lady. I just want some satisfaction with the system. I've spoken all I could think of. Some are saying I've won, but he's still walking around the streets of small town Warrenton, North Carolina.

Thank you. I hope there is something that I can do. I've been praying since, and I'll continue to pray.

Thank you for listening. At least I've told my story to someone.

Ms. Pamela Renee Perry

The defendant argues that this evidence of his prior assault on the victim was improperly offered to prove character, in violation of Rule 404(b) of the North Carolina Rules of Evidence.

The admissibility of specific acts of misconduct by the defendant is governed by Rule 404(b), which provides:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1992). Rule 404(b) is a general rule of inclusion of relevant evidence of other crimes or wrongs committed

by a defendant and is subject to but one exception which requires exclusion of such evidence only if offered to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged. *State v. Syriani*, 333 N.C. 350, 377, 428 S.E.2d 118, 132, *cert. denied*, ——— U.S. ———, 126 L. Ed. 2d 341 (1993), *reh'g denied*, ——— U.S. ———, 126 L. Ed. 2d 707 (1994). In applying Rule 404(b), this Court has repeatedly held that a defendant's prior assaults on the victim, for whose murder defendant is presently being tried, are admissible for the purpose of showing malice, premeditation, deliberation, intent or ill will against the victim. *Id.* at 376-78, 428 S.E.2d at 132; *State v. Spruill*, 320 N.C. 688, 692-93, 360 S.E.2d 667, 669 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988). In the case *sub judice*, the evidence of the defendant's prior assault on the victim, likewise, tends to establish malice, intent, premeditation and deliberation, all elements of first-degree murder. The evidence also tends to establish the defendant's ill will toward the victim. Thus, the evidence is relevant to an issue other than defendant's character. We therefore hold that the evidence of defendant's prior assault on the victim was admissible under Rule 404(b).

The defendant argues, in the alternative, that even if admissible under Rule 404(b), evidence of the prior assault still should not have been admitted, as the danger of unfair prejudice substantially outweighed the probative value of the disputed evidence, thereby rendering such evidence inadmissible under Rule 403 of the North Carolina Rules of Evidence. We disagree. The exclusion of evidence under Rule 403 is a matter generally left to the sound discretion of the trial court. *Syriani*, 333 N.C. at 379, 428 S.E.2d at 133. Abuse will be found only where the trial court's ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." *Id.* We conclude that the trial court did not abuse its discretion by admitting evidence of misconduct otherwise admissible under Rule 404(b).

VIII.

[10] In another assignment of error, the defendant contends that the trial court erroneously admitted hearsay statements by the victim that she was afraid of the defendant, pursuant to the exception to the hearsay rule found in N.C.G.S. § 8C-1, Rule 803(3).

The defendant specifically challenges testimony from five of the State's witnesses: Vonceil Perry, James Hayes, Lawrence Boyd, Sean Brake and Annette Burrows. Witnesses Perry, Hayes, Boyd and Brake

each testified generally that they had spoken with the victim shortly before her murder. During these conversations, the victim had told them that she was afraid of the defendant, that she was receiving threatening phone calls from the defendant, that the defendant was telling her that she had a beautiful face and that he (defendant) was going to "mess [it] up" or "smash it in," and that she believed the defendant was going to kill her. In addition, Annette Burrows, an assistant clerk of court, testified that one or two days before the victim's murder, she spoke to the victim about the defendant's assault proceedings. The victim was upset with the court system, and the victim stated that she was scared of the defendant and that the defendant's conviction "was not going to stop him."

After a *voir dire* of the five witnesses, the trial court admitted the statements into evidence on the grounds that the statements showed the victim's then-existing state of mind pursuant to an exception to the hearsay rule found in Rule 803(3), and that the victim's state of mind was relevant to show the state of her relationship with the defendant. The defendant contends that the trial court erred in this regard because the victim's state of mind was not relevant to the case at hand. Relying on *United States v. Brown*, 490 F.2d 758 (D.C. Cir. 1973), the defendant argues that a victim's state of mind becomes relevant only when the defendant places it in issue by raising the defenses of suicide, self-defense or accident. The defendant further argues that the statements were not admissible under Rule 803(3), as they were statements of memory or belief which are explicitly excluded from the state of mind exception.

It is well established in North Carolina that a murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant. *State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 301-02 (1993) (state of mind relevant to show a stormy relationship between victim and defendant prior to the murder), *cert. denied*, —— U.S. ——, 128 L. Ed. 2d 220 (1994); *State v. Lynch*, 327 N.C. 210, 222, 393 S.E.2d 811, 818-19 (1990) (defendant's threats to victim shortly before the murder admissible to show victim's then-existing state of mind); *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (victim's statements regarding defendant's threats relevant to the issue of her relationship with defendant). Contrary to the defendant's assertions, we have long declined to follow *Brown's* strict rule. *See State v. Alston*, 307 N.C. 321, 298 S.E.2d 631 (1983).

STATE v. ALSTON

[341 N.C. 198 (1995)]

After a thorough review of the record, we conclude that the conversations between the victim and the five witnesses related directly to the victim's fear of defendant and that the victim's statements were properly admitted pursuant to the state of mind exception to the hearsay rule to show the nature of the victim's relationship with the defendant and the impact of defendant's behavior on the victim's state of mind prior to her murder.

The defendant alternatively contends that even if the statements were relevant to show the victim's state of mind, the statements' prejudicial effect outweighs any probative value. The responsibility to determine whether the probative value of relevant evidence is outweighed by its tendency to prejudice the defendant is left to the sound discretion of the trial court. *State v. Coffey*, 326 N.C. 268, 281, 389 S.E.2d 48, 56 (1990). In the instant case, the trial court carefully weighed the probative value of the testimony against its prejudicial effect and made detailed findings to support its conclusion in this regard. The defendant has not demonstrated any abuse of discretion, and therefore, the trial court's ruling will not be disturbed on appeal. This assignment of error is accordingly overruled.

IX.

[11] The defendant next argues that the trial court erred in admitting into evidence the letter purportedly written by the victim, first, on the ground that the letter was not properly authenticated and, second, because the letter was inadmissible hearsay.

Rule 901 of the North Carolina Rules of Evidence provides that "[t]he requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C.G.S. § 8C-1, Rule 901(a) (1992). By way of illustration, the rule specifically recognizes that the requirement of authentication may be satisfied by a non-expert opinion as to the genuineness of handwriting if that witness has familiarity with the purported writer's handwriting. N.C.G.S. § 8C-1, Rule 901(b)(2).

In the case at bar, Vonceil Perry, the victim's mother, testified that she was familiar with her daughter's handwriting, that she recognized her daughter's handwriting, and that the letter was written in her daughter's handwriting. Ms. Perry also testified that the letter was signed "Pamela Renee Perry," and that she recognized the signature as that of her daughter. Based on this evidence, we hold that there

was sufficient evidence of authenticity to support the trial court's admission of the letter into evidence.

**[12]** The defendant next asserts that the trial court erred in admitting the letter under the residual exception to the hearsay rule found in N.C.G.S. § 8C-1, Rule 804(b)(5). However, it is unnecessary to consider whether the letter was properly admitted under the residual hearsay exception. " 'When a hearsay statement is made expressly admissible by a specific exemption category, there is no necessity for the trial court to consider the catch-all provisions of the other rules.' " *State v. Lynch*, 327 N.C. 210, 222, 393 S.E.2d 811, 818 (quoting *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74). The letter, set out in its entirety in Issue VII, shows that at the time it was written, the victim feared the defendant. As shown in Issue VIII, a victim's statements of fear are admissible and relevant to show the status of the victim's relationship with the defendant. *See State v. Cummings*, 326 N.C. at 313, 389 S.E.2d at 74. Thus, the letter was properly admissible under the state-of-mind exception to the hearsay rule found in N.C.G.S. § 8C-1, Rule 803(3). As the letter was more probative than prejudicial, we find no error in its admission. This assignment of error is overruled.

X.

**[13]** By his next assignment of error, the defendant contends that the trial court erroneously admitted testimony of two of the State's witnesses: Deputy Johnny Williams and Detective Fonzie Flowers.

During the presentation of its case, the State called Deputy Williams, one of the investigating officers in this case as well as the assault case. Deputy Williams testified that on 5 December 1990, Vonceil Perry, the victim's mother, informed him that the victim had been "having trouble" with the defendant. Deputy Williams later testified that during his investigation, he also spoke with Brenda Turner, who informed him that she was working at Willoughby's Convenience Store on 1 December 1990, and that the defendant came into Willoughby's at approximately 11:00 p.m. that night and purchased gas and a soft drink with quarters. In each instance, the prosecutor announced that the testimony was being offered solely for the purpose of corroborating the earlier testimony of Ms. Perry and Ms. Turner. The trial court allowed Deputy Williams to testify concerning the prior consistent statements made by Ms. Perry and Ms. Turner and gave proper limiting instructions to the jury. The defendant now contends that Deputy Williams' testimony was inadmissible hearsay

and was therefore improperly admitted to corroborate Ms. Perry's and Ms. Turner's earlier testimony. We disagree.

"A prior statement by a witness is corroborative if it tends to add weight or credibility to his or her trial testimony." *State v. Coffey*, 326 N.C. 268, 293, 389 S.E.2d 48, 63. "One of the most widely used and well-recognized methods of strengthening the credibility of a witness is by the admission of prior consistent statements." *State v. Locklear*, 320 N.C. 754, 761-62, 360 S.E.2d 682, 686 (1987). The fact that the testimony would otherwise be inadmissible hearsay will not prevent its admission for purposes of corroboration. *State v. Rose*, 335 N.C. 301, 321, 439 S.E.2d 518, 529, *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 883 (1994). Admission of Deputy Williams' testimony was accordingly free of error.

**[14]** The defendant next asserts that the trial court erred by admitting the following testimony from Detective Flowers on redirect examination:

Q.  Let me let you look at this document here, Mr. Flowers, and see if that might refresh your recollection.

A.  Yes, sir.

Q.  And was Ms. [Vonceil] Perry interviewed by you, Mr. Sims, and Mr. Williams at that time?

A.  Yes, sir.

Q.  And, Mr. Flowers, did she not state to you on that occasion—

[DEFENSE COUNSEL]: I object to the form of the question.

COURT: Objection is overruled. On cross examination the witness was asked if Ms. Perry ever made any statement that her daughter was afraid of Charlie Alston, and so this is proper redirect. You may proceed.

Q.  —Ah, whether or not she made a statement to you on that occasion that her daughter ". . . Did not have any enemies, although she was afraid of Charlie Mason Alston, a former boyfriend. Ms. Perry stated she knew her daughter was frightened of him. She also remembered her daughter to tell her that she was not going to let anybody run her away from home." Did she make that statement to you on December the 5th, 1990?

A.  Yes, sir; she did.

**STATE v. ALSTON**

[341 N.C. 198 (1995)]

While the defendant contends that the above statement within the prosecutor's question was hearsay, he concedes that the trial court properly allowed the question for the nonhearsay purpose of showing that the statement was in fact made, rebutting the defense's assertion on cross-examination that no such statement had been made. However, the defendant asserts that the form of the question exceeded the scope for which the nonhearsay purpose allowed admission. Defendant contends that the jury could not discern between the two different uses of the evidence and most likely construed the question to be an assertion of truth.

This Court has consistently permitted the introduction of evidence in explanation or rebuttal of a particular fact or transaction even though such latter evidence would be incompetent or irrelevant had it been offered initially. *State v. Syriani*, 333 N.C. 350, 378, 428 S.E.2d 118, 133; *State v. Garner*, 330 N.C. 273, 290, 410 S.E.2d 861, 870 (1991); *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981). In the case *sub judice*, the defendant "opened the door" to the introduction of any incompetent or irrelevant hearsay contained in the prosecutor's question by creating an inference during Detective Flowers' cross-examination that the victim was not, in fact, afraid of the defendant. We find no impropriety with regard to the form of the prosecutor's question, nor do we find that the risk of prejudice to the defendant outweighs the probative value of this evidence. This assignment of error is overruled.

## XI.

[15] In his next assignment of error, the defendant contends that the trial court erred by admitting into evidence court files relating to defendant's prior conviction for assault. The defendant argues that the court files should not have been admitted pursuant to the business record exception to the hearsay rule found in N.C.G.S. § 8C-1, Rule 803(6). We hold that the court files were admitted for a nonhearsay purpose and therefore find it unnecessary to address whether they were properly admitted under Rule 803(6). As previously held in Issue VII, the court files were admitted for the nonhearsay purpose of showing motive, intent and plan. Because the files were not introduced to prove the truth of the matter asserted, the trial court did not err in their admission.

Further, three witnesses testified that the defendant broke into the victim's home on 20 October 1990 and attacked her, and that the victim prosecuted the defendant for the assault and trespass. Other

witnesses testified that the defendant harassed the victim, threatened to "smash in" or "mess up" her face, and that the victim believed the defendant was going to kill her. The court files added little, if anything, to the State's case. The defendant has shown no prejudice by the admission of these files. This assignment of error is accordingly overruled.

## XII.

[16] By another assignment of error, the defendant contends that the trial court erred by admitting evidence of the defendant's drug use shortly after the victim's death. The defendant argues that such evidence was inadmissible character evidence and thereby improperly introduced at the guilt phase, and it was improperly considered by the jury at the penalty phase of the trial. We disagree.

Evidence of prior bad conduct is admissible if it is relevant to any fact or issue other than the character of the accused. *State v. Coffey*, 326 N.C. 268, 279, 389 S.E.2d 48, 54. In the case *sub judice*, Sherry Jiggetts testified that she knew the defendant; that the defendant came to her house and bought forty to forty-five dollars' worth of crack cocaine; and that the defendant paid for the drugs with change consisting of quarters, dimes and nickels. Ms. Jiggetts also acknowledged that she had given a statement to the police and the prosecutor stating that this transaction occurred during the week of the murder. Prior to Ms. Jiggetts' testimony, Vonceil Perry testified that the victim worked at a restaurant and received a large quantity of change from tips; that the victim had over one hundred dollars in quarters in a jar in her bedroom the night before her death; and that when she found the victim, the jar was empty.

The obvious purpose of Ms. Jiggetts' testimony was to show that in the days following the murder, the defendant was making large purchases with change. The testimony was strong circumstantial evidence tending to show that the defendant murdered the victim and stole her tip money from the jar in the bedroom. The evidence was relevant, admissible, and clearly not introduced for the purpose of showing that the defendant was a drug user. This assignment of error is without merit and is accordingly overruled.

## XIII.

[17] By another assignment of error, the defendant contends that the trial court erred by admitting testimony concerning the defendant's actions before and after the victim's murder. The defendant argues

that the testimony from three of the State's witnesses (1) was irrelevant and therefore inadmissible under Rule 402 of the North Carolina Rules of Evidence, or (2) if relevant, was so prejudicial as to outweigh any probative value.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Generally, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1992). This Court has interpreted Rule 401 broadly and has consistently stated that in criminal cases, every circumstance calculated to throw light on the alleged crime is admissible. *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994). We have thoroughly reviewed the testimony of each witness of whom the defendant complains and find each witness' testimony relevant and admissible.

Phyllis Alexander testified for the State that she lived with Sherry Jiggetts, that she remembered seeing the defendant at her home and that the defendant wanted to exchange quarters for forty or forty-five dollars in currency. Ms. Alexander did not recall the exact date but stated she saw the defendant "about the time that [the murder] happened." More than one hundred dollars, consisting mostly of quarters, was stolen from the victim on the night of her murder. Ms. Alexander's testimony is clearly relevant, as it tends to implicate the defendant in the theft of the quarters and therefore the murder.

Esteen Hymon testified that on the night the victim was murdered, the defendant was at her house until 10:00 p.m. The defendant left and returned approximately one hour and thirty minutes later. When he returned, the defendant was "sweating and steam was coming from his body." Mattie Broussart testified that she often gave the defendant rides in her car when he was walking. Ms. Broussart further testified that on the night of the murder, shortly before 11:00 p.m., she saw the defendant walking; that the defendant was walking in the direction of his and the victim's homes, but not in the direction of Ms. Hymon's home; and that she offered defendant a ride, which was refused. Defendant cannot realistically argue that his disappearance for over one hour and thirty minutes, including therein the time period when the victim was murdered, was not relevant. Both Ms. Hymon's and Ms. Broussart's testimony tends to show that the defendant had the opportunity to carry out his threats to kill the victim on the night of the murder. The testimony clearly sheds light on

the murder and makes defendant's guilt more probable than it would be without the evidence.

The defendant argues, in the alternative, that if relevant, the probative value of the testimony was substantially outweighed by the danger of unfair prejudice and was therefore inadmissible under Rule 403 of the North Carolina Rules of Evidence. The exclusion of evidence under Rule 403 is a matter generally left to the sound discretion of the trial court. *Syriani*, 333 N.C. at 379, 428 S.E.2d at 133. The defendant has not demonstrated any abuse of discretion, and therefore, the trial court's ruling will not be disturbed on appeal. This assignment of error is overruled.

### XIV.

[18] The defendant next contends that the trial court erred by admitting into evidence a number of crime scene and autopsy photographs. Specifically, the defendant objects to State's exhibit 3, a crime scene photograph depicting the face of the decedent at the time her body was discovered, and State's exhibits 8, 9, 10 and 11, autopsy photographs illustrating the decedent's injuries.

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). Whether the use of photographic evidence is excessive in light of its illustrative value and whether the evidence is more probative than prejudicial are matters generally left to the sound discretion of the trial court. *Id.* at 285, 372 S.E.2d at 527. Abuse will be found only where the trial court's ruling is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.*

In the case *sub judice*, the defendant argues that State's exhibit 3 was irrelevant and cumulative on the ground that State's exhibit 2, another crime scene photograph, had previously been admitted into evidence. We disagree. Exhibits 2 and 3 were introduced during the testimony of Vonceil Perry. Ms. Perry identified exhibit 2 as a photograph of the victim's body as it appeared on the morning the body was discovered. Ms. Perry further testified that she discovered the victim lying face down on a pillow, that she turned over the victim's head, and that the victim's face was "all smashed in." Ms. Perry testified that

State's exhibit 3 accurately depicted the victim's face as it appeared when she turned the victim over and that the photograph would help her explain what she meant by "all smashed in." Both photographs were received with limiting instructions that they were being admitted for the purpose of "illustrating and explaining the testimony of Vonceil Perry" and were "not to be considered for any other purpose." Such a cautionary instruction limits the likelihood of unfair prejudice. *State v. Syriani*, 333 N.C. 350, 385, 428 S.E.2d 118, 137. Further, each photograph illustrated a different aspect of the witness' testimony and therefore foreclosed the possibility that their use was excessive or repetitive. Defendant has failed to show an abuse of discretion by the trial court in admitting the crime scene photograph of the victim's face.

The defendant next argues that the four autopsy photographs introduced by the State possessed little probative value relative to the risk of prejudice to the defendant and added little to the substance of the medical examiner's testimony. Again, we disagree. Each autopsy photograph depicted isolated areas of injury to the victim's face. Dr. John Butts, the Chief Medical Examiner for the State of North Carolina, testified that each of the four photographs would aid him in illustrating his testimony relative to the injuries he observed on the victim's body. The trial court again gave a proper limiting instruction before admitting the photographs. Contrary to the defendant's assertions, the photographs were not repetitive or excessive and helped illustrate the medical examiner's testimony regarding the victim's injuries and the cause of death. We find no abuse of discretion by the trial court in admitting the autopsy photographs. This assignment of error is overruled.

## XV.

[19] By another assignment of error, the defendant contends that the trial court erred in allowing the prosecutor to use inadmissible evidence during closing arguments, thereby violating his constitutional right to due process. Defendant points to the prosecutor's arguments referring to (1) hearsay statements made by the victim regarding defendant's threats to "smash in" her face and her fear of defendant, (2) the letter written by the victim to her congressman, (3) evidence of the prior assault, and (4) the crime scene and autopsy photographs.

As discussed in Issues VII, VIII, IX, X and XI, each piece of evidence of which the defendant now complains was properly admitted

into evidence. A prosecutor's argument is proper where it is consistent with the record and does not espouse conjecture or personal opinion. *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Counsel may argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom. *Syriani*, 333 N.C. at 398, 428 S.E.2d at 144. In the present case, the prosecutor argued facts properly admitted into evidence. Defendant's argument is without merit and is accordingly overruled.

## XVI.

[20] By another assignment of error, the defendant contends that the trial court erred by failing to intervene *ex mero motu* to correct seven instances of grossly improper conduct by the prosecutor during closing arguments during the guilt-innocence phase of the trial. We note for purposes of our review that the defendant failed to object with respect to any of these instances at any time during the State's closing arguments.

It is well established that control of counsel's arguments is left largely to the discretion of the trial court. *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979). When no objections are made at trial, as here, the prosecutor's argument is subject to limited appellate review for gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu*. *State v. Pinch*, 306 N.C. 1, 17, 292 S.E.2d 203, 218, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995). In order to determine whether the prosecutor's remarks are grossly improper, the remarks must be viewed in context and in light of the overall factual circumstances to which they refer. *Pinch*, 306 N.C. at 24, 292 S.E.2d at 221.

Further, prosecutors are given wide latitude in the scope of their argument. *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144. "Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence." *Johnson*, 298 N.C. at 368, 259 S.E.2d at 761. Counsel may, however, argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom. *Syriani*, 333 N.C. at 398, 428 S.E.2d at 144.

**STATE v. ALSTON**

[341 N.C. 198 (1995)]

In light of these principles, the defendant first argues that he is entitled to a new trial because the prosecutor used hearsay testimony admitted to show the victim's state of mind, not for the purpose admitted, but primarily to show identity, to disprove accident and to prove premeditation and deliberation. Specifically, the defendant complains of portions of the closing argument in which the prosecutor referred to the victim's statements of fear, her belief that the defendant was going to kill her, and her statements relating to the defendant's threats and prior assault.

As discussed in Issue VIII, hearsay evidence must be relevant before it will be admitted under the state of mind exception. Here, the victim's statements were highly relevant to show the status of the victim's relationship to the defendant. The evidence indicated that the relationship was a stormy one at best. The defendant had assaulted the victim approximately one month before the murder, and after his conviction for the assault, the defendant harassed and threatened the victim. It was proper for the prosecutor to argue all reasonable inferences that may be drawn from this evidence. *Syriani*, 333 N.C. at 398, 428 S.E.2d at 144. Clearly, the victim's statements were relevant evidence from which the jury could conclude that the defendant intentionally killed the victim, and that he had done so with malice, premeditation and deliberation. We therefore find no impropriety with the prosecutor's argument in this regard and no error with the trial court's decision not to intervene to prevent this argument.

[21] The defendant next argues that the prosecutor acted improperly by arguing facts outside the record and by expressing his own personal and highly prejudicial opinions. The defendant specifically contends that the prosecutor impermissibly and prejudicially: (1) argued that the defendant killed the victim in retaliation for prosecuting him for assault and that the defendant did not want any other man to have her, (2) argued that the victim was intentionally suffocated, (3) argued that there was "clinical" and "manifold" evidence of defendant's guilt, (4) made irrelevant arguments regarding women's rights, (5) commented that the photographs of the victim made him sick, and (6) expressed opinions regarding the strength of the evidence and the weakness of the defendant's position. After thoroughly reviewing the record, we find that the prosecutor's arguments fall well within the wide latitude accorded prosecutors in the scope of their argument, are consistent with and reasonably inferable from the record, and therefore are not so grossly improper as to require the trial court's intervention.

**[22]**  The defendant next argues that the prosecutor improperly opened his closing argument with a biblical reference which indicated that the jury was ordained by God to condemn the defendant. The defendant, who failed to object at trial, now takes exception to the following statement by the prosecutor:

> Ladies and gentlemen of the jury, "The voice of thy brother's blood crieth unto me from the ground." So spoke the Lord when the first murder was committed on this earth; a murder committed, as this one was, in secrecy, in private and in stealth.

This Court, noting the wide latitude afforded counsel in closing arguments, has disapproved of biblical references only in limited instances where the arguments indicate that the law enforcement powers of the State were divinely inspired or ordained by God. *See State v. Moose*, 310 N.C. 482, 501, 313 S.E.2d 507, 519-20 (1984); *State v. Oliver*, 309 N.C. 326, 359, 307 S.E.2d 304, 326. Here, when viewed in context, the prosecutor was effectively arguing that even though the murder was committed in secret and without any witnesses, the evidence "cried out" that the defendant perpetrated the crime. This remark is in no manner equivalent to saying that state law is divinely inspired or ordained by God. We therefore hold that the remarks were not so improper as to require intervention by the trial court *ex mero motu*.

**[23]** The defendant next argues that the prosecutor acted improperly by commenting on personal characteristics of the victim. The defendant specifically complains of the prosecutor's argument that the defendant hated the victim's father. We find that this argument was a reasonable inference drawn from the evidence in light of the defendant's threat to the victim that "[d]addy can't help you anymore."

Assuming, *arguendo*, that this argument was improper, it was not so grossly improper as to require intervention by the trial court. The defendant has failed to show any prejudice caused by this argument or an abuse of discretion by the trial court in not intervening to prevent an argument that even defense counsel did not believe to be prejudicial when heard.

**[24]**  The defendant next sets out, without discussion, thirteen instances in which he contends the prosecutor improperly commented on his exercise of his rights to remain silent, proof beyond a reasonable doubt, and the presumption of innocence, thereby effectively negating the exercise of these rights. After thoroughly review-

ing each argument at issue, we find none constituting a comment on the defendant's exercise of his right to remain silent, shifting the burden of proof, or depriving defendant of the presumption of innocence.

[25] Finally, the defendant argues (1) that the prosecutor improperly encouraged the jury to convict the defendant on the basis of community sentiment by arguing, "If you can't be safe in your own home, members of the jury, if the law is not going to protect you there, then where is it going to protect you?" and (2) that the prosecutor's use of excerpts from decisions of the appellate courts "confused and misled the jury as to the State's burden to prove every element of the offense beyond a reasonable doubt." Defendant has failed to show how either of these arguments was improper or that he was prejudiced in any manner by the arguments. Accordingly, we hold that these arguments were not so improper as to require the trial court's intervention *ex mero motu*. This assignment of error is overruled.

## XVII.

[26] By another assignment of error, the defendant contends that the trial court erred by overruling his objection to the prosecutorial argument that defendant had failed to contradict or rebut the State's case. The prosecutor made the following argument, to which defendant took exception:

> And all of the evidence that you've heard from this witness stand in this courtroom this week has not been denied, contradicted or rebutted. And so when the evidence comes in, members of the jury, that he was down there at Willoughby's buying gas and a soda with quarters, and when he went off to somebody's house and asked to change forty-five dollars for quarters, that evidence has not been denied, it's not been contradicted, it's not been rebutted. And when evidence comes in that he was over there beating on Pamela Renee Perry with Mr. Hymon there, that evidence has not been denied, contradicted, or rebutted.
>
> . . . .
>
> Members of the jury, the evidence of the man across the street who said he was on the phone the very night that Pamela Perry was dead and she told him that Charlie Mason Alston was calling her, and threatening to beat in her face and to kill her, that's not been denied, contradicted or rebutted.

STATE v. ALSTON

[341 N.C. 198 (1995)]

The defendant contends that by arguing that the State's evidence was uncontradicted, the prosecutor was improperly commenting on the defendant's exercise of his right not to testify. Defendant argues that since the answers raised by the evidence not "denied, contradicted or rebutted" were solely within his knowledge, the prosecutor's argument must be construed as a comment on his failure to testify. We disagree.

This Court has, on numerous occasions, considered and rejected the contention that statements by the prosecutor in closing argument that the evidence was uncontradicted or unrebutted amount to impermissible comments on the defendant's failure to testify. *State v. Erlewine*, 328 N.C. 626, 633, 403 S.E.2d 280, 284 (1991); *see also State v. Eason*, 328 N.C. 409, 402 S.E.2d 809 (1991); *State v. Tilley*, 292 N.C. 132, 232 S.E.2d 433 (1977). It is well settled that the State may properly draw the jury's attention to the failure of the defendant to produce exculpatory evidence to contradict the State's case. *Id.*

We also disagree with the defendant's argument that this case is distinguishable because the answers raised by the evidence not "denied, contradicted or rebutted" were solely within his knowledge. This Court specifically rejected such an argument in *State v. Foust*, 311 N.C. 351, 357-58, 317 S.E.2d 385, 389 (1984), *overruled on other grounds by State v. Diaz*, 317 N.C. 545, 346 S.E.2d 488 (1986). As in *Foust*, we do not consider the unavailability of a witness for the defense to be a determinative factor. *Id.* The evidence was theoretically contradictable by testimony of persons other than the defendant or by cross-examination of the witnesses themselves. This assignment of error is without merit.

XVIII.

[27] The defendant next contends that the trial court erred by denying his request to instruct the jury on second-degree murder as a lesser-included offense of first-degree murder.

Murder in the first degree, the crime of which the defendant was convicted, is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 337 (1986). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Brown*, 300 N.C. 731, 735, 268 S.E.2d 201, 204 (1980). A defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to

support that lesser-included offense. *Id.* at 735-36, 268 S.E.2d at 204. "The determinative factor is what the State's evidence tends to prove." *State v. Strickland,* 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983). If the State's evidence establishes each and every element of first-degree murder, and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration. *Id.*

Here, evidence of the lesser-included offense of second-degree murder is totally lacking. The defendant presented no evidence. The State's evidence tended to show that the defendant harbored malice toward the victim and had threatened to kill the victim by "smashing in" her face. The medical examiner testified that before the victim was killed, she was beaten on the face and neck with an instrument consistent with a hammer, causing extensive injuries. After the beating, the victim was smothered, causing her death. The medical examiner testified that it would have taken at least three or four minutes before the victim died as a result of being suffocated. The medical examiner further testified that the manner of suffocation and the injuries to the victim's face indicated that her face was forcibly held against the pillow until her death.

The fact that the defendant did not bring the murder weapon to the scene of the killing, without more, will not support an instruction for second-degree murder. The evidence permits no other inference than the defendant went to the victim's residence to carry out his threat to "smash in" her face, bludgeoned her mercilessly, and then killed her by forcing her face into a pillow for three or four minutes. The evidence supports a finding of premeditation and deliberation and accordingly an instruction for first-degree murder. To suggest that the defendant acted without premeditation and deliberation is to invite total disregard of the evidence. We therefore conclude that the trial court correctly denied the defendant's request to submit the offense of second-degree murder to the jury. In this assignment, we find no error.

XIX.

[28] By another assignment of error, the defendant contends that the trial court erred by denying the defendant's motion to set aside the verdict based upon the insufficiency of the evidence.

For the evidence to be sufficient in a criminal case, there must be substantial evidence to support a finding of each essential element of

the offense charged. *State v. Roseman*, 279 N.C. 573, 580, 184 S.E.2d 289, 294 (1971). Substantial evidence means "that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Porter*, 303 N.C. 680, 685, 281 S.E.2d 377, 381 (1981). The evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Robbins*, 309 N.C. 771, 774-75, 309 S.E.2d 188, 190 (1983).

In the case *sub judice*, the defendant argues that the evidence was not sufficiently substantial to support a finding that the murder was committed with premeditation and deliberation. We disagree. Premeditation means that the act was thought out beforehand for some length of time, however short. *State v. Skipper*, 337 N.C. 1, 27, 446 S.E.2d 252, 265-66 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 895 (1995). Deliberation means that the defendant formed an intent to kill and carried out that intent in a cool state of blood, in furtherance of a fixed design for revenge or other unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation. *Id.* at 27, 446 S.E.2d at 266. Premeditation and deliberation are ordinarily not susceptible to proof by direct evidence and therefore must usually be proven by circumstantial evidence. *State v. Brown*, 315 N.C. 40, 59, 337 S.E.2d 808, 822-23 (1985), *cert. denied,* 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Circumstances to be considered in determining whether a killing was committed with premeditation and deliberation include the following: (1) want of provocation on the part of the deceased, (2) the conduct and statements of the defendant before and during the killing, (3) threats and declarations of the defendant, (4) ill will or previous difficulty between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, and (6) evidence that the killing was done in a brutal manner. *Id.* at 59, 337 S.E.2d at 823.

We conclude that there was substantial evidence that the killing was premeditated and deliberate. The evidence tended to show all six circumstances set out above. The victim did not provoke the defendant in any manner; the defendant harassed, threatened and assaulted the victim prior to the murder; the victim was rendered helpless by being bludgeoned in the face with a hammer-like instrument; and without question, the killing was accomplished in a brutal manner. In light of such evidence, we hold that there was sufficient evidence to

support the defendant's conviction for first-degree murder on the theory of premeditation and deliberation. The trial court did not err by denying the defendant's motion to set aside the verdict.

SENTENCING PHASE

XX.

[29] By another assignment of error, the defendant contends that the trial court erred by failing to intervene *ex mero motu* to correct seven instances of grossly improper conduct by the prosecutor during closing arguments in the sentencing phase of the trial. As in Issue XVI, the defendant failed to object to any of the arguments of which he now complains, and therefore, the prosecutor's argument will be subject to limited appellate review for gross improprieties which make it plain that the trial court abused its discretion by failing to intervene *ex mero motu. State v. Pinch*, 306 N.C. 1, 17, 292 S.E.2d 203, 218.

The defendant first argues that the prosecutor acted improperly by using the hearsay testimony admitted to show the victim's state of mind, not for the purpose admitted, but primarily to argue (1) that the defendant planned the crime and did not act under emotional disturbance, (2) that the defendant had a significant history of criminal activity, and (3) that the murder was committed in retaliation for the victim's testimony against defendant in an earlier trial for assault. Other than his unsupported allegations of impropriety, the defendant fails to show how the foregoing arguments were improper or how the trial court abused its discretion by not intervening to prevent these arguments. Based on our review of the record, we find no impropriety with the prosecutor's arguments and no error with the trial court's decision not to intervene to prevent them.

[30] The defendant next argues that the prosecutor acted improperly by arguing facts outside the record and by expressing his own personal and prejudicial opinions. The defendant specifically contends that the prosecutor impermissibly (1) argued that the defendant held and choked the victim, (2) argued that the defendant "didn't lose his temper when he went to [the victim's] house," (3) argued that the defendant "took the law into his own hands," and (4) opined that "we [the prosecution] have proven [our case] beyond a reasonable doubt." After thoroughly reviewing the record, we hold that the prosecutor's arguments fall well within the wide latitude accorded prosecutors in the scope of their arguments and are consistent with the record.

**STATE v. ALSTON**

[341 N.C. 198 (1995)]

The prosecutor's argument that the defendant held the victim down and continued to hold her until she suffocated is supported by the medical examiner's testimony that, in his opinion, the victim had to have been forced face down in the pillow for three or four minutes to suffocate. The comment that the victim was "choked" rather than "suffocated" was not so grossly improper as to warrant the trial court's intervention. Each word essentially means to interfere with another's breathing. The evidence clearly established the cause of the victim's death was asphyxiation. We find no reasonable possibility that the use of the word "choke" confused the jury in any manner.

The prosecutor's argument that the defendant did not "lose his temper" at the victim's house is a permissible inference drawn from facts upon which the jury could conclude that the defendant went to the victim's house to carry out a long-intended killing and did not act under the influence of a sudden, violent passion or legal provocation. The prosecutor's statement that the defendant "took the law into his own hands" was nothing more than an expression that the defendant took matters into his own hands by killing the victim. Finally, the argument that the State had proven its case beyond a reasonable doubt was not expert testimony as argued by defendant, but rather was a permissible statement of the State's position. The trial court's intervention was not required to prevent any of the foregoing arguments by the prosecutor.

[31] The defendant next argues that the prosecutor improperly commented on his failure to testify. The prosecutor made the following argument, about which the defendant now complains:

If there was any evidence he [defendant] was under any mental or emotional disturbance when he got in the car of that trooper, don't you know they would have him on the stand testifying that he was under some mental or emotional disturbance that evening?

When read in context, this argument does not appear to be a comment on the defendant's failure to testify. Although less than clear, it appears the prosecutor was referring to the trooper not testifying, not the defendant. This segment of the argument, as it seems intended, was that the trooper observed the defendant's behavior, and had the defendant been under any emotional disturbance, the defense would certainly have called the trooper to so testify. In any event, assuming, *arguendo*, that the prosecutor's argument was improper, the impro-

priety was not so gross or excessive that we would conclude the trial court abused its discretion by failing to intervene *ex mero motu*.

[32] The defendant next contends that the prosecutor inaccurately stated the law as to the statutory aggravating circumstances submitted by the trial court and as to the defendant's burden of proof regarding mitigating circumstances. The defendant, however, fails to point to any particular statement by the prosecutor which he contends misstated the law, nor has the defendant cited any authority showing that a particular statement was incorrect. After a careful review of the record, we find no instance in which the prosecutor's argument misstated the law. Further, had there been a misstatement of the law by the prosecutor, any such misstatement would have been cured by the trial court's proper instructions to the jury. *See State v. Dodd*, 330 N.C. 747, 755, 412 S.E.2d 46, 50.

[33] The defendant next argues that the trial court erred by not intervening *ex mero motu* to prevent the prosecutor's three-minute pause intended to show the period of time it took for the victim to die of asphyxiation. This Court rejected a similar argument in *State v. Artis*, 325 N.C. 278, 323-25, 384 S.E.2d 470, 496-97 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991).

In *Artis*, the prosecutor asked the jurors, *over defendant's objection*, to hold their breath as long as they could during a four-minute pause clocked by the prosecutor. Noting that the argument occurred in the sentencing phase of trial, this Court found it neither improper nor prejudicial. *Id.* at 325, 384 S.E.2d at 497. We reasoned that during sentencing, the emphasis is on the nature of the crime and the character of the criminal, and therefore, urging the jurors to appreciate the circumstances of the crime by voluntarily suffering oxygen deprivation was not improper. *Id.*

In the case *sub judice*, the defendant argues that this case is distinguishable from *Artis* for two reasons. First, in *Artis*, the cause of death was manual strangulation which required conscious physical exertion to cause death. Here, the defendant argues, there is no credible proof that the defendant held the victim to cause her asphyxiation and, therefore, no correlative amount of moral blameworthiness. Second, the defendant argues that unlike *Artis*, the actual sequence of events was unknown. Therefore, without knowing whether the victim was conscious when she suffocated, the amount of time between the beginning of asphyxiation and death is not relevant to the victim's suffering.

We disagree. The evidence clearly established that the defendant forcibly held the victim's head down into a pillow for at least three or four minutes. The medical examiner testified that, in his opinion, the victim could not have suffocated by any other manner. Clearly, this crime entails a correlative amount of moral blameworthiness to that in *Artis*, which bears directly on the defendant's character. Further, the length of time it took for the victim to die of asphyxiation is relevant to the character and circumstances of the crime regardless of whether the victim suffered. Finally, the defendant here, unlike *Artis*, failed to object to the prosecutor's argument and therefore must show that the prosecutor's argument amounted to a gross impropriety before we will find that the trial court abused its discretion by failing to intervene *ex mero motu. State v. Pinch*, 306 N.C. at 17, 292 S.E.2d at 218. In light of our previous holding in *Artis*, we find no impropriety whatsoever with the prosecutor's argument and accordingly no error with the trial court's decision not to intervene to prevent it.

[34] The defendant next contends that the prosecutor acted improperly by requesting that the jury not consider sympathy for the defendant's family in its consideration of mitigating circumstances.

This Court has stated that "a defendant's eighth amendment rights are jeopardized only when the jury is urged to ignore such feelings that are supported by facts in the record." *State v. Price*, 326 N.C. 56, 87, 388 S.E.2d 84, 102, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated on other grounds*, —— U.S. ——, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated on other grounds*, —— U.S. ——, 129 L. Ed. 2d 888, *on remand*, 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 224, *reh'g denied*, —— U.S. ——, 131 L. Ed. 2d 879 (1995). In the present case, the prosecutor argued:

> When the defense asks you to find this as an aggr—as a mitigating factor, they're asking you to do it out of sympathy. They're asking you to do it because you feel sorry for Mr. Alston's parents. But in this case, ladies and gentlemen of the jury, the evidence simply does not support any finding that this defendant had any mental or emotional disturbance. . . . He's before you today, asking you to find some reason in your hearts to feel sympathy for him. And you may feel some sympathy for his family, ladies and gentlemen of the jury. But when . . . you were selected as jurors, you were asked if you could do your duty in this case. And your

duty in this case, I submit to you, is to find as an aggravating factor . . . .

It is clear that when read in context, the prosecutor was not asking the jurors to ignore any feelings of sympathy that are supported by the facts. The prosecutor acknowledged that the jurors may have feelings of sympathy for the defendant's family, but argued that their duty nevertheless required them to recommend the death penalty. The defendant has failed to show that the prosecutor's argument was improper or that the trial court abused its discretion by not intervening *ex mero motu.*

[35] The defendant next contends that the prosecutor's argument diminished the jury's sense of responsibility for determining the appropriateness of death, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231 (1985).

In *Caldwell*, the Supreme Court held it unconstitutional to argue that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. *Id.* at 328-29, 86 L. Ed. 2d at 239. This Court has limited *Caldwell's* applicability to those cases in which the prosecutor "suggest[s] to the jurors that they could depend upon judicial or executive review to correct any errors in their verdict." *State v. McCollum*, 334 N.C. 208, 226, 433 S.E.2d 144, 153 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied,* —— U.S. ——, 129 L. Ed. 2d 924 (1994). In this case, the prosecutor argued that the jurors had a duty, under the evidence presented, to recommend the death penalty, and that they were "servants of the law." The prosecutor did not, however, suggest to the jurors that they could depend upon judicial or executive review to correct any errors they might make. Accordingly, we find no error with regard to this aspect of the prosecutor's argument.

Finally, the defendant contends generally that he is entitled to a new sentencing hearing in light of the "persistent" prosecutorial misconduct above referenced. As we have reviewed the defendant's arguments and found no error or gross improprieties with respect to the prosecutor's closing argument, this general argument must also be dismissed. These assignments of error are accordingly overruled.

## XXI.

[36] By another assignment of error, the defendant contends that the trial court erred by failing to sustain his objection to the prosecutor's improper comments on the relative deterrent values of life imprison-

ment and the death penalty and to racially inflammatory remarks. The prosecutor made the following argument, to which the defendant took exception:

> The only way you can be sure that this man will never walk out again is to give him the death penalty. Oh, you might say, let's let him have life in the penitentiary. Do you know where the word penitentiary came from? The same root word as penitent. You see, the notion was when we built penitentiaries hundreds of years ago, that we would lock people up in a cell for a while and let them be penitent, and think about what they had done, and they would rationally come out and be different people. I argue and I suggest to you, members of the jury, it's difficult to be penitent with televisions, and basketball courts, and weight rooms. It's difficult to be penitent—

> [DEFENSE COUNSEL]: Your honor, I object.

> [PROSECUTOR]: —when you stand around and rap all day—

> COURT: Ladies and gentlemen, again, you will take your instructions on the law from the court. The attorneys have an opportunity to argue to you what they contend the punishment should be.

> [PROSECUTOR]: It's difficult to be penitent, members of the jury, sitting around rapping.

It is well established that control of counsel's arguments is left largely to the control and discretion of the trial court. *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761. It is equally well settled that prosecutors are given wide latitude in the scope of their argument. *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144.

The defendant first argues that the prosecutor's argument violated this Court's decision in *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, by "arguing against the general deterrent" value of a life sentence. However, when the portion of the argument to which defendant refers is read in context with the rest of the argument, it is clear that the prosecutor did not espouse the position that prison does not deter.

The prosecutor began this portion of his closing argument, "The only way you can be sure that this man will never walk out again is to give him the death penalty." This is a permissible argument that the jury should recommend the death penalty to foreclose further crimes

by the defendant. *See Zuniga,* 320 N.C. at 269, 357 S.E.2d at 920 (allowing argument that imposition of death penalty will foreclose further commission of crimes by defendant). The prosecutor's subsequent argument that it is hard to be penitent with televisions, basketball courts, and weight rooms emphasized the prosecution's position that life in prison was not an adequate punishment. In *State v. Reeves,* 337 N.C. 700, 448 S.E.2d 802 (1994), *cert. denied,* — U.S. —, 131 L. Ed. 2d 860 (1995), this Court upheld an argument in which the prosecutor commented that if sentenced to life, the defendant would have a "cozy little prison cell . . . with [a] television set, air conditioning and three meals a day." *Id.* at 732, 448 S.E.2d at 817. As in *Reeves,* we hold that the argument did not relate to general deterrence, but served to emphasize the State's position that the defendant deserved the penalty of death rather than a comfortable life in prison. In light of the wide latitude accorded prosecutors during their arguments, we find that the defendant has failed to show that the prosecutor's argument was improper, or that the trial court abused its discretion in allowing it.

The defendant next argues that the prosecutor's comments "stand around and rap all day" and "sitting around rapping" violated his right to equal protection by denigrating a form of music closely identified with the black race, thereby encouraging the jury to make its decision on the basis of racial prejudice. We disagree. The common definition of "rap" is "to talk." The defendant has presented no argument to convince this Court that the word "rap," as used by the prosecutor, meant anything else. Accordingly, we find no error in the use of the word "rap."

The defendant next contends that the prosecutor's argument violated his First Amendment rights because "rapping" is protected by the First Amendment and the prosecutor may not argue a First Amendment activity, or the prevention thereof, as a basis for imposing the death penalty. Regardless of whether the prosecutor intended the word "rap" to mean "talk" or "sing," it is clear that he did not argue that the defendant should be put to death because he "rapped." We find no error with respect to this argument. This assignment of error is overruled.

## XXII.

[37] In a related assignment of error, the defendant contends that the trial court erred by failing to intervene *ex mero motu,* with respect to the above argument, to prevent the prosecutor's improper innuendo

that the duration of a life sentence would be minimal, when in fact he would not become eligible for parole for twenty years. There is no manner in which the prosecutorial argument set forth above can reasonably be construed to address the defendant's parole eligibility. Contrary to defendant's assertion, the prosecutor argued that the jury should impose the death penalty in order to insure that the defendant never kills again. It has always been a fact of prison life that murder is no stranger there. This is a proper argument in all respects. *Zuniga*, 320 N.C. at 269, 357 S.E.2d at 920. Accordingly, this assignment of error is overruled, as defendant has failed to show any gross impropriety requiring the trial court's intervention *ex mero motu*.

## XXIII.

**[38]** In another assignment of error, the defendant contends that the evidence was insufficient to support the submission of three aggravating circumstances to the jury.

First, the defendant argues that the evidence was not sufficient to submit to the jury the aggravating circumstance that the murder "was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (Supp. 1994).

This Court has identified several types of murders which may warrant submission of the "especially heinous, atrocious, or cruel" aggravating circumstance:

> One type includes killings physically agonizing or otherwise dehumanizing to the victim. A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," including those which leave the victim in her "last moments aware of but helpless to prevent impending death." A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder."

*State v. Sexton*, 336 N.C. 321, 373, 444 S.E.2d 879, 908-09, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994) (citations omitted).

In determining the sufficiency of the evidence to support the submission of an aggravating circumstance to the jury, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference drawn therefrom. *Syriani*, 333 N.C. at 392, 428 S.E.2d at 141. Applying these principles, we conclude that the evidence here supports not only a conclusion that the killing

was physically agonizing, conscienceless, pitiless and unnecessarily dehumanizing to the victim, but also supports a finding that the killing involved psychological terror not normally present in murder.

The evidence tends to show that the defendant repeatedly beat the victim with a hammer or similar blunt object. The majority of the wounds were to the victim's face. The victim suffered severe swelling, bruising and lacerations to her face. Other blows to the victim's neck caused hemorrhaging inside her neck, in the area around the larynx and inside the trachea. The victim's skull was not fractured, but the beating was severe enough to cause bleeding over the surface of her brain and in her eyes. These blows, however, did not cause the victim's death. At this point, the victim's life was in the hands of the defendant. Instead of sparing the victim's life after inflicting this punishment, the defendant, acting without conscience or pity, forced the victim's face into a pillow, suffocating her. The medical examiner testified that it takes at least three or four minutes for a person to die by suffocation, but if the blood supply to the brain is completely interrupted, the person will become unconscious within seven to ten seconds. Although seemingly a short period of time, "when struggling for the breath of life it can be an eternity." *State v. Artis*, 325 N.C. 278, 320, 384 S.E.2d 470, 494.

Additionally, evidence of the defendant's threats to "smash in" the victim's face and kill the victim, defendant's assault on the victim a little more than one month prior to the killing and the victim's letter and statements made prior to her death, suggest that she feared the defendant. It is reasonable to infer that the victim suffered psychological torture and anxiety as her fears were realized and the defendant carried out his threats. In the last minutes of the victim's life, as her face was forced into the pillow and she struggled to breath, she undoubtedly was left aware of, but unable to prevent, her impending death.

This evidence supports a finding that the killing was physically agonizing and involved psychological terror not normally present in murder. *See State v. Sexton*, 336 N.C. at 373-74, 444 S.E.2d at 909 (finding evidence of extreme anguish and psychological terror where death caused by strangulation took three to four minutes, left the victim conscious for at least ten seconds, and left the victim knowing that death was impending but helpless to prevent it); *State v. Artis*, 325 N.C. at 319-20, 384 S.E.2d at 493-94 (finding evidence of psychological suffering where victim killed by strangulation rendering her

helpless, but aware of, impending death). We conclude that the evidence of psychological terror combined with the unrelenting murderous effort on the part of the defendant to kill the victim clearly supported a finding that the murder was "especially heinous, atrocious, or cruel."

[39] Next, the defendant argues that the evidence was not sufficient to submit to the jury the aggravating circumstances that the murder was committed for pecuniary gain and that the murder was committed against a former witness against the defendant because of the exercise of her official duty. N.C.G.S. § 15A-2000(e)(6), (e)(8). We disagree. First, the victim was found dead two days after testifying against the defendant in the assault trial. This evidence supports the submission of the former witness aggravating circumstance. Second, over one hundred dollars in change was stolen from the victim's bedroom and witnesses testified that shortly after the murder, the defendant was making purchases with change. This evidence supports the pecuniary gain aggravating circumstance. There was no evidence that the defendant's sole motive for killing the victim was jealousy. Clearly, the evidence was sufficient to support an inference that the defendant sought to kill the victim in retaliation for testifying against him and to rob her of her money. Each aggravating circumstance was supported by the evidence and was properly submitted.

This Court has held that the erroneous submission of an aggravating circumstance in a capital sentencing procedure is not reversible *per se*, but rather, is subject to a harmless error analysis. *See State v. Taylor*, 304 N.C. 249, 285-86, 283 S.E.2d 761, 784 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983). Assuming, *arguendo*, that the trial court erred by submitting the pecuniary gain and former witness aggravating circumstances, we hold that any such error was harmless.

The victim was murdered in a brutal and senseless manner. The jury found that the murder was especially heinous, atrocious, or cruel. The jury did not find any mitigating circumstances. Based on the foregoing, it is unreasonable to believe that absent a finding that the victim was a former witness or that the defendant killed the victim for the money in the jug, the jury would have ignored the fact that the defendant mercilessly and brutally killed the victim and thus would have found that the death penalty was not justified. Accordingly, this assignment of error is overruled.

XXIV.

[40] In his next assignment of error, the defendant contends that the jury's failure to find clearly proven mitigating circumstances violated his constitutional rights. Specifically, defendant argues that the evidence was uncontroverted as to the existence of one statutory mitigating circumstance and two nonstatutory mitigating circumstances and that the jury's failure to find them constitutes error.

First, the defendant argues that given the uncontradicted evidence that the defendant did not have a significant history of prior criminal activity, the jury was required to find the existence of this statutory mitigating circumstance. The defendant misinterprets the law relative to uncontradicted evidence of statutory mitigating circumstances. We first find that the evidence before the jury in the present case was not uncontradicted in regard to the defendant's prior criminal history. Evidence regarding defendant's prior assault on the victim was susceptible to a finding by the jury that the defendant had a significant history of criminal activity.

In those cases where the evidence is truly uncontradicted, the defendant is, at most, entitled to a peremptory instruction when he requests it. *State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979). A peremptory instruction tells the jury to answer the inquiry in the manner indicated by the trial court *if it finds* that the fact exists as all the evidence tends to show. *Id.* at 75, 257 S.E.2d at 617. The defendant did not request a peremptory instruction in the present case. However, even where all of the evidence supports a finding that the mitigating circumstance exists and a peremptory instruction is given, the jury may nonetheless reject the evidence and not find the fact at issue if it does not believe the evidence. *Id.*

The jury's failure to find this statutory mitigating circumstance does not indicate that the jury was prevented from or failed to consider it. To the contrary, this mitigating circumstance was submitted, thus, the jury was required to consider it. The jury simply declined to find that the evidence supported this mitigating circumstance.

[41] The defendant also contends that the jury was required to find two nonstatutory mitigating circumstances: (1) that the defendant was regularly employed at the time of the offense, and (2) that the defendant has a supportive family structure. As stated above, it is the prerogative of the jury to believe or reject the evidence presented by

the defendant as to the existence of a mitigating circumstance. Unlike statutory mitigating circumstances, the jury may determine that a nonstatutory mitigating circumstance has no value even if that circumstance is found to exist. *State v. Fullwood*, 323 N.C. 371, 395-97, 373 S.E.2d 518, 533-34 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991). Thus, as to these two mitigating circumstances, the jury either did not believe the evidence and on that basis determined that the mitigators did not exist, or it determined that the mitigators did exist but decided that they had no mitigating value and on that basis rejected them.

We therefore conclude that the jury's failure to find these three mitigating circumstances did not violate any of the defendant's constitutional rights. This assignment of error is accordingly overruled.

## PRESERVATION ISSUES

**[42-44]** The defendant raises three issues which he concedes have been decided against him by this Court: (1) the trial court erred by instructing the jury that it must determine whether the evidence supported each nonstatutory mitigating circumstance submitted and whether it had mitigating value, (2) the trial court erred by instructing the jury that it had a "duty" to recommend a sentence of death if it determined that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to warrant the imposition of the death penalty, and (3) the trial court erred by denying his motion to eliminate the death penalty on the grounds that the North Carolina death penalty statute is unconstitutional. We have considered the defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule these assignments of error.

The defendant raises five additional issues which are not conceded, but which nevertheless should have been treated as preservation issues.

**[45]** First, the defendant contends that the trial court erred by instructing the jury on the "especially heinous, atrocious, or cruel" aggravating circumstance because the instruction was inherently vague. This Court has previously considered and rejected the defendant's argument. *See State v. Syriani*, 333 N.C. 350, 389-92, 428 S.E.2d 118, 139-41.

STATE v. ALSTON

[341 N.C. 198 (1995)]

**[46]** Second, the defendant contends that the trial court's instruction defining mitigating circumstances erroneously focused the jury's attention on the killing itself, thereby limiting the jury's ability to consider the defendant's character and background as a basis for a sentence less than death. We note that the instructions given were virtually identical to the North Carolina Pattern Jury Instructions. This Court has previously rejected this argument, holding that instructions identical to those given in the present case were a correct statement of the law of mitigation. *See State v. Robinson*, 336 N.C. 78, 122, 443 S.E.2d 306, 327-28.

**[47]** Third, the defendant contends that the trial court's instruction on defendant's burden of proof in establishing mitigating circumstances erroneously defined "preponderance of the evidence" as evidence which "must satisfy you" of the existence of any mitigating circumstance. Specifically, defendant argues that the term "satisfy" is vague and subjective and that "preponderance of the evidence" should have been defined as "more likely than not." This precise argument has previously been considered and rejected by this Court. *See State v. Payne*, 337 N.C. 505, 531-33, 448 S.E.2d 93, 108-09 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995).

**[48]** Fourth, the defendant contends that the trial court erred by instructing the jury that premeditation and deliberation may be inferred from "lack of provocation by the victim." Defendant argues that this instruction misled the jury and impermissibly shifted the burden of proof to the defendant on an element of the offense. This Court has previously considered and rejected this argument. *See State v. Skipper*, 337 N.C. 1, 32-34, 446 S.E.2d 252, 269-70; *State v. Handy*, 331 N.C. 515, 525, 419 S.E.2d 545, 549-50 (1992).

**[49]** Finally, defendant contends that the trial court erred by refusing to submit as a nonstatutory mitigating circumstance that "the State's case in chief against the defendant was based solely upon circumstantial evidence." This Court has previously held that trial courts should not submit lingering doubt of guilt as a mitigating circumstance, as it has no bearing on a defendant's character or record or the circumstances of the offense. *State v. Hill*, 331 N.C. 387, 415, 417 S.E.2d 765, 778-79 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993).

We have considered the defendant's arguments on these additional issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule these assignments of error as well.

STATE v. ALSTON

[341 N.C. 198 (1995)]

PROPORTIONALITY REVIEW

[50]  Having found no error in either the guilt-innocence or sentencing phases, we are required by statute to review the record and determine (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether passion, prejudice, or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We have thoroughly reviewed the record, transcript and briefs in the present case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). We defined the pool of cases for proportionality review in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), and we compare the instant case to others in the pool that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

In the case *sub judice*, the jury found the defendant guilty of first-degree murder under the theory of malice, premeditation and deliberation. The trial court submitted three aggravating circumstances, each of which the jury found: that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); that the murder was

STATE v. ALSTON

[341 N.C. 198 (1995)]

committed against a former witness because of the exercise of her official duty, N.C.G.S. § 15A-2000(e)(8); and that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). The jury declined to find the existence of any of the six statutory and nonstatutory mitigating circumstances submitted for its consideration.

This case has several distinguishing characteristics: the jury convicted the defendant under the theory of premeditation and deliberation; the victim's brutal murder was found by the jury to be especially heinous, atrocious, or cruel; the victim was killed in her own bedroom during the night; the victim suffered great physical and psychological pain before death; the victim was not only in pain, but was aware of her impending death as she was suffocated; the victim was of unequal physical strength to defendant; the victim feared the defendant; and finally, the defendant failed to exhibit remorse after the killing. These characteristics distinguish this case from those in which we have held the death penalty disproportionate.

"Of the cases in which this Court has found the death penalty disproportionate, only two involved the 'especially heinous, atrocious, or cruel' aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983)." *Syriani*, 333 N.C. at 401, 428 S.E.2d at 146-47. Neither *Stokes* nor *Bondurant* is similar to this case.

In *Stokes*, the defendant and a group of coconspirators robbed the victim's place of business. The evidence failed to show who the "ringleader" of the group was or that defendant Stokes deserved a sentence of death any more than another party to the crime who received only a life sentence. In the present case, the defendant alone was responsible for the victim's death. Defendant Stokes was only seventeen years old at the time of the crime. In this case, the defendant was thirty-one years old at the time of the crime. In *Stokes*, the defendant was convicted under a theory of felony murder, and there was virtually no evidence of premeditation and deliberation. In the present case, the defendant was convicted upon a theory of premeditation and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506. Finally, in *Stokes*, the victim was killed at his place of business. In this case, the victim was killed in her bedroom. A murder in one's home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a

right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

In *Bondurant*, the victim was shot while riding with the defendant in a car. *Bondurant* is distinguishable because the defendant immediately exhibited remorse and concern for the victim's life by directing the driver to go to the hospital. The defendant also went into the hospital to secure medical help for the victim, voluntarily spoke with police officers, and admitted to shooting the victim. In the present case, by contrast, after rendering the victim helpless by repeatedly beating her in the face with a hammer, the defendant literally held the victim's life in his hands. Instead of seeking aid for the victim, the defendant chose to take her life, smothering her with a pillow as she lay aware yet helpless to prevent her impending death. Additionally, after taking the victim's life, the defendant showed an utter lack of remorse by stealing her money and using it to buy drugs.

As noted above, one distinguishing characteristic of this case is that three aggravating circumstances were found by the jury. Of the seven cases in which this Court has found a sentence of death disproportionate, including *Stokes* and *Bondurant*, in only one, *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), did the jury find the existence of multiple aggravating circumstances. In *Young*, this Court focused on the failure of the jury to find the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance. The present case is distinguishable from *Young* in that one of the three aggravating circumstances found by the jury was that the murder was especially heinous, atrocious, or cruel.

For the foregoing reasons, we conclude that each case where this Court has found a sentence of death disproportionate is distinguishable from the case *sub judice*.

There are two similar cases in the pool in which the jury recommended a sentence of death after finding as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879; *State v. Rose*, 335 N.C. 301, 439 S.E.2d 518.

In *Sexton*, this Court found the sentence of death proportionate on facts strikingly similar to the present case. In both cases, the victims were killed by asphyxiation, and many of the same injuries were inflicted. As here, the jury found three aggravating circumstances,

one of which was the "especially heinous, atrocious, or cruel" aggravator, and no mitigating circumstances. This Court held the sentence of death proportionate, noting, as we have above, that only two cases in which the "especially heinous, atrocious, or cruel" aggravating circumstance was found have ever been held disproportionate, and that only one case in which the jury found multiple aggravating circumstances has ever been held disproportionate.

In *Rose*, the defendant murdered his victim by beating and strangling her. The jury found two aggravating circumstances, including that the murder was especially heinous, atrocious, or cruel. The sentence of death was held proportionate.

The defendant relies on two cases in which the jury recommended life sentences as being similar to this case. *State v. Bullock*, 326 N.C. 253, 388 S.E.2d 81 (1990); *State v. Whiteside*, 325 N.C. 389, 383 S.E.2d 911 (1989).

*Bullock* is similar to the present case in the manner of death, yet is still distinguishable. In the present case, the defendant was thirty-one years of age. In *Bullock*, the defendant was only nineteen years of age. In addition, in the present case, the jury found multiple aggravating circumstances but failed to find any mitigating circumstances. In *Bullock*, the jury found the existence of four statutory mitigating circumstances, including that the defendant was mentally or emotionally disturbed and that the defendant's ability to appreciate the criminality of the crime was impaired.

*Whiteside* is similar to the present case in that the medical examiner testified that, in his opinion, the cause of death was strangulation. Other evidence tended to show that the victim was severely beaten as well. However, the medical examiner's testimony indicated that his evidence of death was not consistent with that of a severe beating. The jury found one aggravating circumstance, that the murder was "especially heinous, atrocious, or cruel," and four statutory mitigating circumstances. In the present case, multiple aggravating circumstances were found by the jury, and no mitigating circumstances were found. In addition, in *Whiteside*, the evidence showed that the killing resulted from an altercation provoked by the victim. In the present case, the decedent was the victim of an unprovoked and long-intended killing.

Further, regardless of how similar the cases cited by defendant may be to the present case, we noted in *State v. Daniels*, 337 N.C. 243,

446 S.E.2d 298 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995), that similarity of cases is not the last word on the subject of proportionality. *Id.* at 287, 446 S.E.2d at 325. Similarity "merely serves as an initial point of inquiry." *Id.; see also State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 46-47. The issue of whether the death penalty is proportionate in a particular case ultimately rests "on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances." *Daniels*, 337 N.C. at 287, 446 S.E.2d at 325.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that the defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.